67 So.2d 920 (1953)
BRUNO et al.
v.
EMPLOYERS' LIABILITY ASSUR. CORP., Limited, et al.
No. 20103.
Court of Appeal of Louisiana, Orleans.
November 16, 1953.
Ronald L. Faia and James A. Comiskey, New Orleans, for plaintiffs and appellees.
Miazza & Drury, New Orleans, for defendants and appellants.
McBRIDE, Judge.
The six plaintiffs are the owners in indivision of the wooden-frame double dwelling known as 4121-25 Palmyra Street. Claiming that their property was damaged to the extent of $1,175 by pile-driving operations conducted in connection with the erection of a wing of the Jesuit High School immediately across the street from their property, they brought this suit against the Jesuit High School of New Orleans, Perrilliat-Rickey Construction Company, Inc., who was the general contractor, Edward A. Hemenway, a subcontractor, The Employers' Liability Assurance Corporation, Ltd., the liability insurer of the Jesuit High School and the contractor, and the American Mutual Liability Insurance Company, the liability carrier of the subcontractor, all in solido. Plaintiffs specifically allege that the driving of the piles was done in a negligent manner and *921 resulted in excessive and unreasonable jarring and vibration, which caused the damages complained of.
At the inception of the trial below the plaintiffs abandoned their claim against the American Mutual Liability Insurance Company. The trial resulted in a judgment against the remaining defendants solidarily for the sum of $189, from which they have appealed. In an answer to the appeal plaintiffs pray that the judgment be increased to the sum of $945.
The defense to the suit is that all operations in connection with the pile-driving work were done in a proper and workmanlike manner without negligence on the part of either the owner, contractor, or subcontractor, and that the work caused no damage whatsoever to plaintiffs' property; alternatively, it is averred by defendants that whatever defects there may be in plaintiffs' property arose through normal settlement of the building or normal conditions prior to any operation connected with the Jesuit High School building.
The record discloses that a total of 810 piles of 60-foot length were driven at a location about 60 or 70 feet removed from plaintiffs' property. A 10,000-pound hammer, when lowered on top of a pile about to be driven, from its sheer weight, would force the pile almost half its distance into the ground, and as the piles penetrated the ground the compaction of the earth required blows to drive them even for a short distance. The piles were driven 5 feet below normal ground level. The occupant of the premises 4125 Palmyra Street testified that during the course of the work she heard the pile driving and felt a vibration therefrom "like the whole house was jumping." She heard plaster breaking and discovered particles of dust which had fallen behind the wallpaper. The vibration was so severe, according to her testimony, that a mirror on one of the walls shook and she had to remove her vases from the mantel. This witness stated that the only cracks in the house prior to the pile driving were in the kitchen and had been in existence for about six years, but that before the work was done the other rooms in the house were in good condition so far as the plastering and wallpaper are concerned. This witness stated further that a photographer took certain photographs of various parts of her house before the commencement of the pile driving, and that the only interior pictures were those made of the kitchen.
Four other witnesses for plaintiffs testified that while the pile-driving work was going on there was considerable vibration. One of these, who lives at 4121 Palmyra Street, stated that she removed from a wall one mirror, but that another mirror fell from its hanging position to the floor. She also testified, as did the occupant of the other side of the house, that she heard the trickling of sand particles in back of the wallpaper. She was also sure that there were no cracks in the plastering and that there was no torn wallpaper prior to the pile-driving work.
All of the witnesses above mentioned, except Calvo, first observed the cracks in the walls and broken and torn wallpaper within a short time after the pile driving had ceased. Dates given by each witness vary, but substantially they are in agreement that the cracking of the walls and the rifts of the paper became more obvious in the month following the pile-driving operation. The undisputed evidence is that plaintiffs' building is at least forty years old and that very little repair work had been done to it for many years. There were cracks in the kitchen plastering and some buckling of the wallpaper, which resulted from sinking or subsidence of the building long before the pile driving started; some doors and windows were out of frame; the front steps were pulled away from the mooring, and the hearths showed evidence of considerable subsidence. There is evidence that the original subsidence and resulting cracks were due to the lowering of the water table as a result of modern drainage systems, and that shifting of the earth under the premises caused the settlement or subsidence. The photographs mentioned were made before the work was started and show the dilapidated condition *922 of the premises; other pictures taken after the work had been completed show the same condition with little or no change in the appearance of the house. The photographs, twenty-two in number, were made by a commercial photographer at the instance of the contractor.
The defendants have shown beyond per adventure of doubt that the driving of the piles was conducted in the regular and customary manner, and that the contractor and his subcontractor were in no wise negligent. Defendants attempted a showing that there was little or no vibration incidental to the work. A representative of the contractor, and Mr. Shilstone, an engineer, and Mr. Wakefield, a mechanical engineer, made a survey of the neighborhood, including plaintiffs' premises, and the contractor had the photographs made showing the condition of the buildings in the neighborhood before the pile-driving operation began. Tests were also made with an instrument referred to as a drop-pin seismograph or seismometer to test the vibration resulting from the concussion of the hammer striking the piles. The scene of one test was the front steps of plaintiffs' premises and another was made a short distance away. The instrument used was described as a wooden box about 7 inches square and about 18 inches high, which operates by steel rods a quarter of an inch in diameter and ranging in height from 3 inches to 15 inches, these rods being balanced on a glass plate which is levelled by micrometer screws adjusted to glass water gauges. The rods or pins are set on the level glass plate and any vibration of the earth beneath the instrument will cause the pins either to wobble or to fall. Both Messrs. Shilstone and Wakefield testified that the seismograph indicated that no vibration resulted from the pile driving, notwithstanding that the instrument was utilized for periods of as much as half an hour. Mr. Wakefield stated that while his seismometer indicated no vibration emanating from the pile driving, there was some slight vibration caused by passing traffic as recorded by the instrument.
There seems to be one apparent weakness in these instrumental tests for vibration, for the witnesses testified that the seismograph was not kept in operation throughout the work but was only intermittently set up at various times. For instance, Mr. Shilstone testified that he set up his seismograph only for the driving of specific piles. The instrument was placed in operation and observed during the driving of the pile number 8 and again for pile number 3 in footing number 20, and then in another position for the observation of pile number 3 in footing number 22, the instrument being used approximately fifteen minutes per pile. Mr. Wakefield testified that he left his instrument in a set up position for various periods of time at least three or four times each week the pile driving was in progress.
We find it extremely hard to believe that the pile driver having a hammer of such weight driving piles of such length created no vibration, especially in view of the testimony of occupants of plaintiffs' premises and other witnesses to the effect that they felt vibrations emanating from the pile-driving operations, and that plaintiffs' house shook to such an extent that a mirror fell from the wall and that vases had to be removed from the mantel in order to avoid damage. It also occurs to us that as the number of piles driven into the ground increased the earth became more impacted and that there was vibration, at least, caused by the piles driven during the latter stages of the operation.
Even though the contractor and the subcontractor have proven themselves to be free of negligence in the doing of a lawful thing, the record convinces us that the vibration from the work done by them caused damage to the interior of the plaintiffs' house. As we have already said, the exterior was dilapidated and in a state of disrepair as the consequence of natural wear and tear, the building being not less than forty years old. We also believe, as testified to by Mr. Shilstone, that the system of subsoil drainage which lowered the water level and withdrew moisture from the soil caused the building to settle more or less unevenly.
*923 However, one significant fact stands out. The occupants of the house testified that the only defects in the interior walls existed in the kitchen and that there were no cracks in the plastering or wallpaper in the other rooms. As has been pointed out, the contractor had a survey made of the houses in the neighborhood before the work was commenced and had photographs made by a commercial photographer showing the state and condition of the buildings. The photographer took such pictures as were directed by the contractor, but insofar as the interior of plaintiffs' house is concerned the only pictures are those of the walls and ceiling in the kitchen. This, to our minds, lends credence to the plaintiffs' witnesses who positively stated that cracks were evident in the kitchen only, and we feel sure that if the plastering had been cracked and the wallpaper torn in the other rooms that the contractor would have had his photographer perpetuate evidence thereof photographically in order to avoid the consequences of a suit such as this.
Mr. Murvan M. Maxwell, an architect, examined the interior of plaintiffs' house a few months after the pile-driving work had been completed. This witness in testifying for plaintiffs stated that he found cracks in seven of the rooms, which, from his examination, appeared to be fresh and new. He admitted that those cracks in the kitchen were old and of longer standing. In connection with his examination of the premises the architect prepared a comprehensive plan showing minutely just where the new or fresh cracks found by him were located.
As opposed to this testimony of Mr. Maxwell, certain witnesses for the defendants testified that the cracks alluded to on the Maxwell plan pre-existed the pile-driving project, and that the work could not have been the cause of them.
Mr. Maxwell could not state positively what caused the fresh or new cracks, but taking his testimony in connection with the testimony of the plaintiffs' witnesses that there were no previous cracks in the interior walls other than those in the kitchen, we are convinced that the pile-driving operations did inflict some damage upon plaintiffs' building.
Mr. Maxwell frankly admitted that any number of circumstances could have caused the cracks and torn wallpaper, such as the vibration occasioned by passing traffic and windstorm. However, in that plaintiffs were damaged to some extent by the pile driving, Jesuit High School of New Orleans and its insurer, The Employers' Liability Assurance Corporation, Ltd., are liable unto them. Such liability flows from LSA-C.C. art. 667 which is the embodiment of the legal maxim "sic utere tuo, ut alienum non laedas," and reads:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
In the case of Hauck v. Brunet, La.App., 50 So.2d 495, 497 (writs refused), we held that it was unnecessary for the plaintiff, in order to recover from the owner, to adduce proof that the owner or his contractor either acted unlawfully or negligently in performing pile-driving work, and that liability for damages to the plaintiff's property flowed from the "good neighbor doctrine" enunciated in the quoted codal article. We said:
"* * * Under the unambiguous provisions of the article, the damage itself to the neighboring property constituted faultthe fault of Brunetfor which he is responsible, even in the absence of any showing of negligence on his part. * * *"
However, neither the contractor, its surety, nor the subcontractor is in any way liable or legally responsible for the loss and damage sustained by plaintiffs. In Loesch v. R. P. Farnsworth & Co., La.App., 12 So. 2d 222 (writs refused), we held that in the absence of a showing of negligence on the part of the pile-driving contractor, an adjoining proprietor could not recover from him damages occasioned by pile-driving operations.
*924 The difficulty in this case, however, is in determining the amount of plaintiffs' damages. We find ourselves in the same situation as that which confronted the Supreme Court in the case of Germann v. 557 Tire Co., 107 La. 578, 120 So. 13, 15. The Court was called upon to award damages for injuries sustained by a building possibly eighty years old. The plaintiff claimed $5,000. The evidence in that case, as here, showed that the building had suffered natural wear and tear, and that for more than twenty-five years and up to a few years before the trial the street in front of plaintiff's property was occupied by the tracks of an interstate steam railroad, over which long and heavy freight trains were constantly moving to and fro with consequent severe vibration to the buildings fronting on the street. The evidence also showed that the subsoil drainage put into operation by the City of New Orleans lowered the water level tending to withdraw moisture from the soil, in consequence whereof the foundations of all buildings in the city settled more or less unevenly, with consequent damage to walls and plastering everywhere. While it was impossible to fix exactly how much of the damage was caused by the activities of the defendant since no survey of the building was made at the time the operation was begun, the Court was of the opinion that it was nonetheless quite certain that some of the damage was caused through the fault of the defendant and rendered judgment for $750. The Court made these observations:
"But the bare fact that a plaintiff cannot establish exactly the amount of damages suffered by him and occasioned by the fault of the defendant will not suffice to discharge said defendant, when it is clear that plaintiff has in fact suffered some damages. Green v. Farmers' Consolidated Dairy Co., 113 La. 869, 37 So. 858.
"Under such circumstances, the court must fix the quantum of such damages as best it can with the lights before it, and finds itself `in the position of having to assess damages "as in cases of offenses, quasi offenses and quasi contracts," wherein "much discretion must be left to the judge or jury."' Schmidt v. City of New Orleans, 160 La. 281, 107 So. 110."
In the instant case we are compelled to more or less arbitrarily fix the amount of plaintiffs' damages. Plaintiffs secured a written bid in which a painting and decorating contractor proposed to remove the existing wallpaper, repair the walls, and repaper in three rooms and the kitchen of 4121 Palmyra Street and in four rooms of 4125 Palmyra Street, for the price of $945. As we have already said, the kitchen of 4121 Palmyra Street was in a damaged condition prior to the pile-driving operations, and, therefore, plaintiffs are entitled to no recovery for any work which may have to be done in the kitchen. The bid, unfortunately, is for the blanket sum of $945, and there is no itemization of the cost of the work to be done in any particular room.
Due to that fact and also to the fact that we find it extremely difficult, if not impossible, to fix with certainty the exact physical damage sustained by plaintiffs' house, we believe under the doctrine enunciated by the Supreme Court in Germann v. 557 Tire Co., supra, and in Schmidt v. City of New Orleans, 160 La. 281, 107 So. 110, cited therein, that plaintiffs, who have shown that they did actually suffer some damage, should have judgment against Jesuit High School of New Orleans and its surety for the sum of $500, which will do substantial justice to all concerned.
Therefore, for the reasons assigned, the judgment appealed from is amended so as to provide that plaintiffs have judgment against the defendants, Jesuit High School of New Orleans and The Employers' Liability Assurance Corp., Ltd., jointly and in solido, in the full sum of $500, together with legal interest from judicial demand and costs; it is also ordered that the judgment appealed from be further amended so as to provide that there be judgment in favor of defendants Perrilliat-Rickey Construction Company, Inc., and Edward A. Hemenway, and against the plaintiffs, dismissing *925 plaintiffs' suit against said defendants at plaintiffs' cost.
And as thus amended and in all other respects the judgment appealed from is affirmed.
The defendants Jesuit High School of New Orleans and The Employers' Liability Assurance Corp., Ltd., are to bear the costs of this appeal.
Reversed in part; amended and affirmed in part.