HAMLIN, Justice.
In the exercise of our supervisory jurisdiction, we directed certiorari to the Court of Appeal, Second Circuit, in order that we might review its judgment, which affirmed a judgment of the trial court rejecting the demands of Philco Finance Corporation and Arkansas Radio and Appliance Company of Little Rock, Arkansas, (hereinafter referred to, jointly, as Philco) against Fidelity Credit Company, Inc. (hereinafter referred to as Fidelity). Art. VII, Sec. 11, La.Const. of 1921; La. App., 191 So.2d 716; 250 La. 28, 193 So.2d 531.
The facts of record reflect that during April, 1960, W. C. Winkle, who had been engaged in the furniture and appliance business in Springhill, Louisiana, opened an establishment in Minden, Louisiana. He did business as Winkle Furniture and Appliance Company (hereinafter referred to as Winkle), which business was transferred on November 14, 1960 to Winkle Furniture and Appliance Company, Inc. (hereinafter referred to as Winkle, Inc.).
The stipulated facts of record reflect that, “During a period of time beginning in the year 1959 and terminating with a final shipment on September 26, 1960, Philco was selling to Winkle various Philco appliances consisting primarily of television sets, washing machines, refrigerators and freezers, which appliances were purchased by Winkle on credit and paid for by Winkle only after each such appliance was sold by Winkle to his customers. On October 8, 1960, a physical inventory of the Philco appliances shipped by Philco to Winkle was taken by a Philco representative; that the unpaid balance due by Winkle to Philco on the respective purchase prices of the Philco appliances thus inventoried was as of October 8, I960, in the total sum of $18,735.70; and that the fair market wholesale value of said appliances was as of October 8, 1960, no less than $18,735.70.” Philco had a vendor’s lien and privilege securing the unpaid balance of the purchase price due on the appliances sold.
The stipulated facts further reflect that, “As of November 16, 1960, a physical inventory of the Philco appliances shipped by Philco to Winkle was taken by a Philco representative; that the unpaid balance due by Winkle to Philco on the respective purchase prices of the Philco appliances thus inventoried was as of November 16, 1960, in the total sum of $13,249.17; and that the fair market wholesale value of said appliances was as of November 16, 1960, no less than $13,249.17.
*8 “ * * *
“No payments have been made since September 28, 1960, by Winkle, Winkle, Inc., or any other party to Philco on the unpaid portion of the respective purchase prices due by Winkle to Philco on the aforesaid appliances sold by Philco to Winkle and neither Winkle, nor Winkle, Inc., is entitled to any credit thereon except for the sum of $3,400.00 received by Philco by virtue of the bankruptcy sale. * * * ”
The stipulated facts also reflect that on January 24, 1961, after a writ of sequestration issued on the petition of Fidelity, Winkle, Inc.’s stock of merchandise included Philco appliances having a fair market wholesale value of $9,965.00.
During the time that Winkle and Winkle, Inc. were engaged in the furniture and appliance business, financial negotiations were executed with Fidelity. Customer contracts or customer paper were purchased by Fidelity in accordance with dealer agreements, June 6, 1958, April 12, 1960 and November 23, 1960. Under the dealer agreements when an appliance or article of furniture was sold on credit, the retail customer would execute a promissory note for the unpaid portion of the purchase price, secured by a chattel mortgage covering the merchandise. The note was transferred by Winkle to Fidelity for its face value less a discount. In the case of default on note payments, Winkle agreed to reimburse Fidelity for the rtnpaid balance on the defaulted note.
During the summer of 1960, many notes were in default, and Winkle was unable to pay Fidelity. On September 26, 1960, Winkle executed a real estate mortgage to Fidelity in the amount of $60,000.00. On September 28, 1960, Winkle executed to Fidelity a floor plan agreement in the principal amount of $17,336.92; it then executed, on September 28, 1960, a collateral chattel mortgage note for $25,000.00 payable to Fidelity. The chattel mortgage securing the note recited in part:
“ * * * all of Mortgagor’s stock of merchandise composed of Liquefied Petroleum gas ranges, refrigerators, water heaters, storage containers, space heaters, furnaces and other equipment, parts and appliances now located at the place or places of business of the Mortgagor as herein set forth or in any other place of business or storage maintained or used by Mortgagor in said county or within said State to include all of Mortgagor’s stock of such merchandise complete with all present and future attachments, accessories, replacements and additions as security for all moneys, not to exceed $25,000.00 outstanding at any one time, that may be advanced by Mortgagee to Mortgagor for the purchase of merchandise from time to time and after the date hereof until this mortgage is cancelled, and in consideration of and to *10 secure said advances Mortgagor does hereby grant, bargain, sell and convey unto Mortgagee, its successors and assigns, all of said chattels.
“ t- H= *
“AND PROVIDED FURTHER that Mortgagor may retain possession of said chattels until any default hereunder. * * * ” (Emphasis ours.)
On January 24, 1961, on application of Fidelity, a writ of sequestration issued from the 26th Judicial District Court ordering the Sheriff of Webster Parish to sequester and take into his possession all of the stock of merchandise of every kind, type and class located at the place or places of business of W. C. Winkle and/or Winkle, Inc. On January 26, 1961, the writ was maintained under the bond filed.[1]
On approximately January 26, 1961, Fidelity brought suit against W. C. Winkle and Winkle, Inc. on the defaulted customer paper. It prayed for $71,651.66. It also prayed for recognition of its liens, privileges and chattel mortgages on the properties which had been sequestered, and that the properties be ordered sold, according to law, Fidelity being paid out of the proceeds of the sale the full amount of its claims by privilege, preference and priority. Fidelity further prayed alternatively for recognition of its ownership of a $25,172.79 floor-plan.
Philco intervened in Fidelity’s suit, praying, among its many demands, that its vendor’s liens and/or chattel mortgages be held superior to any rights of Fidelity. It also prayed that Fidelity be held liable as receiver to intervenor. Many other interventions were filed in this matter, but we are herein only concerned with that of Philco.
On trial, counsel for Philco stated that various alternative causes of action were set forth in its intervention, but that the issue had been narrowed down to a claim that Fidelity violated the Bulk Sales Law of Louisiana in accepting chattel mortgages covering the whole stock of merchandise of Winkle without first complying with the provisions of the Bulk Sales Law. Counsel urged that under the Bulk Sales Law, Fidelity was liable to the creditors of Winkle as a receiver for the fair market value of the goods mortgaged — the entire stock of merchandise. Philco limited its claim to the first chattel mortgage ($25,000.00) and to the merchandise on hand at the time it was given.
At the time of trial, June 10, 1965, Winkle, Inc. had been placed in involuntary bankruptcy,[2] and the trustee in bankruptcy was named as a substituted party.
*12 The trial court did not assign written reasons for judgment.
The Court of Appeal, however, stated that Fidelity conceded that the mortgage under attack was patently void as to the creditors of the transferor, having been executed in violation of LSA-R.S. 9:2961, and that the court was presented only with the effect of noncompliance with the Bulk Sales Act by Fidelity and the latter’s liability, if any, . to Philco under LSA-R.S. 9:2963. It concluded that, in spite of the definition assigned to the word “mortgage” ,in LSA-R.S. 9:2965 as being a transfer, enforcement of the provision making the transferee receiver necessarily contemplated that the transferee (mortgagee) should have received the property. This event did not happen herein; the Court therefore affirmed the judgment of the trial court.
In this Court, Philco urges that the conclusion of the Court of Appeal is erroneous, and that it is entitled to recover from Fidelity as receiver the sum of $19,487.92.[3]
Fidelity submits that the opinion of the Court of Appeal is correct and should be affirmed.
In 1894, the Legislature, in order to define and punish certain misdemeanors in trade and commerce, enacted Act 166.[4] This act was criminal in nature and had as its purpose the protection of a vendor’s credit sales from the illegal acts of a cheating, absconding or defrauding vendee.
Act 94 of 1896 amended Act 166 of 1894 ; it contained five sections whereas the act of 1894 contained three. Section 4 of the Act of 1896 provided, “ * * * That whosoever shall wilfully and knowingly purchase in blocks goods, wares, or merchandise, unpaid for by the seller, without exacting from said seller a written statement sworn to showing that said goods, wares or merchandise have been paid for, shall be guilty of a misdemeanor and on conviction shall be fined in an amount in the discretion of the court and .suffer imprisonment for not less than six *14 nor more than twelve months.” Section 5 of the Act of 1896 provided that “the failure of the purchaser under section 4 to exact a signed or sworn statement from the seller required in said section, shall be each prima facie evidence of fraudulent intent within the meaning of this act as to warrant both criminal and civil proceedings.”
Act 114 of 1912, which amended and reenacted Act 166 of 1894, provided in Section 6 that a vendee of a sale in bulk who did not conform to certain provisions of the act should upon the application of any of the creditors of the vendor or transferor become a receiver and be held accountable to such creditors for all the goods, wares or merchandise that came into his possession by virtue of such sale or transfer. This act limited the criminal provisions of the earlier acts but provided civil remedies for creditors.
The Bulk Sales Law was rewritten by Act 270 of 1926. Criminal sanctions, except in a few enumerated cases, were omitted. Section 3 provided that a transferee who did not comply with the provisions of the act should at the suit of any creditor be held liable to all the creditors of the transferor as receiver for the fair value of all the property so transferred to him. Section 5 provided that, “transfers under this Act shall include transfers in payment of debt, in whole or in part, pledges, mortgages, sales, exchanges, and assignments, whether for cash or on credit or in exchange for certificates of stock, bonds or other obligations of a corporation, * * [5] (Emphasis ours.)
In 1931, in the case of Rapides Packing Co. v. Olla State Bank, 17 La.App. 267, 135 So. 772, the Court of Appeal stated, “It is plain from the provisions of sections 1 and 5 of Act No. 270 of 1926, that the placing of a mortgage on the fixtures and out of the usual course of trade is void as against a creditor of the mortgagor unless the provisions of Act No. 270 of 1926. are complied with.”
In 1932, in the case of First Nat. Bank of Shreveport, La. v. Sharp, 54 F.2d 886, the U. S. Fifth Circuit Court of Appeals stated:
“ * * * We think it does not admit of question that the statute, in prohibiting except in compliance with its terms, the mortgaging of all or substantially all of the fixtures used in the conduct of a merchant’s business otherwise than in the *16 ordinary course of trade, and in the regular and usual prosecution of business, in clear and unmistakable language interdicts all such mortgages irrespective of whether given for past or present consideration, if they are not in the ordinary course of trade, unless the requirements of the statute insuring the fair and equal treatment of the creditors of the transferror have been complied with. Where a mortgage of fixtures has been made, the only question of fact which arises under the statute is whether the mortgage is in the ordinary course of trade and in the regular and usual prosecution of the transferror’s business.”
LSA-R.S. 9:2961, which has as its source Act 270 of 1926, provides :
“The transfer in bulk and otherwise than in the ordinary course of trade and in the regular and usual prosecution of the business of the transferor, of any portion or the whole of a stock of merchandise, or merchandise and fixtures, or of all or substantially all of the fixtures or equipment used or to be used in the display, manufacture, care, or delivery of any goods, wares, or merchandise including movable store and office fixtures, horses, wagons, automobile trucks and other vehicles or other goods or chattels of the business of the transferor shall be void as against the creditors of the transferor, unless made in conformity with the provisions of this Part. * * * ”
LSA-R.S. 9:2963 provides:
“Any person to whom any of the property mentioned in R.S. 9 :2961 shall be so transferred, who shall pay any part of the consideration therefor to such transferor, or who shall execute or deliver to the transferor or to his order, or to any person for his use, any promissory note or other evidence of indebtedness for the transfer or any part thereof without first having demanded and received from the transferor or from his agent the statement provided for in R.S. 9:2962 B. verified as therein provided, and without paying or seeing to it that the purchase money or other consideration of the transfer is applied to the payment of the bona fide claims of the creditors of the transferor pro rata according to the dignity of their several claims as shown upon the verified statement, and without first having sent the notices of said transfer and such statement of creditors as provided for in R.S. 9 :2962 C., shall at the suit of any creditor, be held liable to all the creditors of the transferor as receiver for fair value of all the property so transferred to him. * * * ” (Emphasis ours.)
LSA-R.S. 9:2965 sets forth as follows the transfers to which the Bulk Sales Law is applicable:
“Transfers under this Part include transfers in payment of debt, in whole or *18 in part, pledges, mortgages, sales, exchanges, and assignments, whether for cash or on credit or in exchange for certificates of stock, bonds, or other obligations of a corporation, otherwise than in the ordinary course of trade and in the regular and usual prosecution of the business of the tranferor, * * * ” (Emphasis ours.)
Fidelity contends that despite the fact that the instant mortgage is void, the above statutes obviously restrict the liability as a receiver to a person who falls in the category of Section 9:2963. It further contends that the person made liable is a person: (1) to whom the property (stock of merchandise) shall be so transferred, and -(2) who shall pay any part of the consideration without first having received a statement of creditors and without seeing that the purchase money or other consideration is applied to the payment of the creditors pro rata. Fidelity therefore contends that it cannot be made vicariously liable.
The stipulated facts recite that, “ * * * None of the 'Chattel Mortgages’ referred to above were given in the regular course of trade and in the regular and usual prosecution of the business of Winkle or Winkle, Inc. as those terms are used in L.R.S. 9:-2961. Each aforesaid chattel mortgage was given by Winkle or Winkle, Inc. to secure current as well as future and contingent indebtednesses.”
We find that when the Legislature passed Act 270 of 1926 and in Section 5 thereof stated that transfers include mortgages, and, later, in the Revised Statutes, LSA-R.S. 9:2965, again said that transfers under the Bulk Sales Law include mortgages, it intended the word “transfer” to encompass “mortgage.” We also conclude that LSA-R.S. 9:2965 does not stand separate and apart from the other provisions of the Bulk Sales Law. Therefore, wherever the word “transfer” appears in the law, it encompasses the word “mortgage.” We find nothing in the statute indicating an intention to the contrary. See, 82 C.J.S. Statutes § 348, p. 728. The Act of 1926 as well as the Bulk Sales Law forming a part of the Revised Statutes are free from ambiguity; the letter of them cannot be disregarded. See, LSA-C.C. Art. 13; Hibernia Nat. Bank in New Orleans v. Louisiana Tax Commission, 195 La. 43, 196 So. 15; State v. El Rito Transp. Co., 193 La. 548, 190 So. 803. “Where the legislature deliberately amends an act or repeals an act and enacts a new statute changing the provisions of the prior statute by using words conveying a different meaning, the courts are not authorized to ascribe a meaning at variance with the plain import of the language used as that would be exercising legislative functions and would in effect operate as a judicial repeal.” Succession of Thomson, 221 La. 791, 60 So.2d 411.
*20 Counsel for Philco correctly urges that LSA-R.S. 9:2963 could be read as follows:
“Any person to whom any of the property mentioned in R.S. 9:2961 shall be so transferred, who shall pay any part of the consideration therefor to such transferor, * * * without first having demanded and received from the transferor or from his agent the statement provided for in R.S. 9:2962 B. * * * shall at the suit of any creditor, be held liable to all the creditors of the transferor as receiver for the fair value of all the property so transferred to him. * * * ” i,
It is to be noted that “ * * * A mortgage is the alienation of a right in the property, not the alienation of the property itself. Perfect ownership becomes imperfect when the property is mortgaged, by the alienation of that real right; but the title and the possession still remain in the owner. * * * ” Duclaud v. Rousseau, 2 La.Ann. 168. “ * * * in the case of a mortgage the title remains in the debtor, whereas in the case of a sale it does not; but what difference does this make when the mortgage empties the title of all value so far as the recourse of the plaintiff against the property is ■ concerned, * * *. While mortgage does not transfer the title, nor even a dismemberment of it, it nevertheless creates a real right upon the property. C.C. art. 3282. .And to that extent it is an alienation of it. And that is why the legal capacity to mortgage must be the same as that to alienate. C.C. art. 3300. Mortgage is just as efficacious as sale for putting property beyond the reach of a creditor. * * * ” Thompson v. Calcasieu Trust & Savings Bank, 140 La. 264, 72 So. 958.
Under our conclusions supra, we find that under the Bulk Sales Law it is not necessary that a mortgagee receive the mortgaged property in order for him to be held liable to all the creditors of the mortgagor as receiver for the fair value of all the property so mortgaged to him.
There is no reason for a lengthy discussion as to whether Fidelity paid Winkle and Winkle, Inc. any consideration for the instant mortgage. The stipulated facts disclose that consideration was paid, and the collateral note and mortgage themselves recite consideration.
The record and the briefs indicate that the amount of $19,487.92 claimed by Philco is not controverted. However, Fidelity has only prayed for an affirmance of the judgment of the Court of Appeal. It has not had an opportunity to present argument with respect to the amount allegedly due; this it has a right to do. The trial court rejected Philco’s demands and, of course, did not pass upon this phase of the case.
We do not feel that we are in a position to render a money judgment upon the terms of the stipulation as written. The stipulation may need interpretation, or *22 explanation, by the taking and submission of evidence so that the fair value of the property mortgaged may be determined by the trier of facts. This is particularly so in view of the bankruptcy of Winkle, Inc. We conclude that the matter must therefore, in the interest of justice, be remanded to the trial court for the purpose of establishing the amount due Philco.
For the reasons assigned, the judgment of the Court of Appeal, Second Circuit, is reversed and set aside. The cause is remanded to the district court for further proceedings according to law and consistent with the views herein expressed. Costs of these proceedings to be paid by Fidelity. All other costs to await the final determination of this cause.
HAMITER, J., dissents, being of the opinion that the judgment of the Court of Appeal is correct.
HAWTHORNE, J., dissents, being of the view that the judgment of the Court of Appeal, 191 So.2d 716, is correct and should be affirmed.
SANDERS, J., dissents being of the opinion that the result reached by the Court of Appeal is correct.
HAMITER, HAWTHORNE and SANDERS, JJ., are of the opinion a rehearing should be granted.

. Fidelity evidently considered its mortgages valid at this time, as it was endeavoring to recover thereunder.

. The stipulated facts recite that, “on May 17, 1961, a petition in involuntary bankruptcy was filed against Winkle, Inc. in proceedings under Docket Number 10,-028 in the United States District Court for the Western District of Louisiana, Shreveport Division. Winkle, Ine. was formally adjudicated a bankrupt in said proceedings on May 30, 1961.”

. In brief, Philco states: — “It was further stipulated that Winkle’s total indebtedness to Philco at the time of the transaction herein complained of was in the amount of $28,425.94 * * *. Thus, in addition to Philco’s privileged claim, Philco had a claim as a general creditor of Winkle in the sum of $9,690.24, which claim is 11.1 per cent of the total claims of all creditors in the amount of $87,104.-08 (after deducting Philco’s secured claim • of $18,735.70 from the total claims of $105,839.78). As a general creditor of Winkle, Philco is entitled to be paid the sum of $4,152.22 by Fidelity, as receiver, that being Phileo’s 11.1 per cent pro rata share, as a general creditor, of the fund in the amount of $37,407.39 for which Fidelity is liable to all creditors of Winkle (after deducting the value of the merchandise in the amount of $1S,-735.70, on which Philco had a vendor’s lien, from the total value of all merchandise transferred in bulk by Winkle to Fidelity in the amount of $56,143.09).
“Finally, Fidelity is entitled to a credit of $3,400.00 on such sum as is awarded to Philco herein because of the previous receipt by Philco of a partial payment on the Winkle indebtedness.”

. See, 39 Tul.L.Rev. p. 415; 10 Tul.L.Rev. pp. 131 and 471.

. In 1930, in the case of Item Co. v. National Dyers & Cleaners, 15 La.App. 108, 130 So. 879, the Court of Appeal stated:
—“The situation which confronted the Legislature of Louisiana was similar to that which faced the Legislatures of practically all the other states of the Union. It was found that the small and impecunious merchandiser could fill his shelves with stock purchased from wholesalers and then, without notice to the wholesalers, dispose over night of his entire stock leaving the wholesaler or other seller of merchandise without recourse against the person to whom the stock had been transferred.”