762 F.2d 1250
 54 USLW 2020
 Joseph PERKINS, Plaintiff-Appellant,
v.
F.I.E. CORPORATION, Defendant-Appellee.
Judie RICHMAN, Individually and as Personal Representative
of the Estate of Kathy Newman, Deceased, Plaintiff-Appellee,
v.
CHARTER ARMS CORPORATION, Defendant-Appellant.
 Nos. 83-3451, 83-3591.
 United States Court of Appeals,
Fifth Circuit.
 June 17, 1985.
Rehearing and Rehearing En Banc Denied in No. 83-3591 July 15, 1985.
 
 Talbot, Sotile, Carmouche, Marchand & Marcello, Victor L. Marcello, Donaldsonville, La., for Perkins.
 Bienvenu, Foster, Ryan & O'Bannon, Ernest L. O'Bannon, John C. Tollefson, Robert N. Ryan, New Orleans, La., for F.I.E. Corp.
 Henry B. Bruser, III, Bangor Punta Corp., John B. Glendon, Greenwich, Conn., for amicus-Bangor Punta.
 David R. Frohn, Geralyn P. Garvey, Brian G. Meissner, Lake Charles, La., for Charter Arms Corp.
 Mark K. Benenson, New York City, for amicus-Second Amendment Foundation.
 Frank G. Jones, James B. Sales, Houston, Tex., for amicus-R.G. Industries.
 Richard E. Gardiner, Robert J. Dowlut, Washington, D.C., for amicus-National Rifle.
 Nicholas E. Calio, Washington, D.C., Paul D. Kamenar, Wash. Legal Found., Donald E. Santarelli, M. Stuart Madden, Washington, D.C., for amicus-Washington Legal.
 John J. Gunther, Exec. Dir., U.S. Conference of Mayors, Stephen Chapple, Gen. Counsel, Washington, D.C., Salvador Anzlemo, City Atty., Daniel Zimmerman, Asst. City Atty., City of New Orleans, New Orleans, La., for amicus-The U.S. Conference of Mayors, et al.
 Windle Turley, Dallas, Tex., for Richman.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, WILLIAMS, and HILL, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 The plaintiffs in this consolidated appeal seek to recover damages from the manufacturers of small caliber handguns that caused severe injury during the perpetration of one crime and the death of the victim in another crime. The plaintiffs present two theories of recovery. First, they argue that the marketing of a dangerous weapon to the general public is an ultrahazardous activity giving rise to absolute liability under Louisiana law. Second, they argue that the handgun used in the two crimes is an unreasonably dangerous product giving rise to strict products liability,[1] because of its small size, enabling it to be easily concealed, coupled with marketing of it to the general public. The district court in No. 83-3451 granted summary judgment in favor of the defendant on both theories; we affirm. The district court in No. 83-3591 granted summary judgment in favor of the defendant on the products liability theory, but refused summary judgment in favor of the defendant on the ultrahazardous activity theory. We affirm the judgment in favor of the defendant on the products liability issue; we reverse the summary judgment in favor of the plaintiff on the ultrahazardous activity issue and remand with instructions to enter summary judgment in favor of the defendant on both theories.
 
 I. FACTS
 A.
 
 2
 This consolidated appeal presents two cases in each of which a criminal using a small caliber handgun shot an innocent victim. On September 18, 1981, Claude Nichols shot Joseph Perkins at the Cut Rate Lounge in Tangipahoa Parish, Louisiana. Nichols entered the lounge after participating in a fight in the barroom's parking lot. He began senselessly firing a .25 caliber automatic pistol at the individual with whom he had been fighting. The barroom was crowded, and two innocent patrons, including Perkins, were wounded. Perkins was struck in the spine and is now permanently paralyzed from the waist down. Nichols pleaded guilty to the crime of aggravated battery and was sentenced to five years of hard labor.
 
 
 3
 F.I.E. Corporation allegedly manufactured and distributed the handgun used by Nichols. Perkins filed suit against the defendant manufacturer in the 21st Judicial District Court for the Parish of Tangipahoa. The defendant removed the suit to federal court under diversity jurisdiction. The plaintiff alleged that the pistol manufactured by the defendant "is defective in that it is unreasonably dangerous in normal use, that the hazard of injury to human beings exceeds the utility of the pistol and this defect constitutes a proximate cause" of the injury. The plaintiff invoked as a basis for liability La.Civ.Code art. 2315, which provides, in essential part, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The plaintiff admitted in answers to interrogatories that there was no defect in the design of the gun, no defect in the manufacture or assembly of the component parts of the gun, no statutory prohibition to the manufacture or distribution of the gun, and that Claude Nichols was not at the time of the shooting an agent, employee, or servant of F.I.E. Corp. The district court granted the defendant's motion for summary judgment without a written opinion, and the plaintiff appealed.
 
 B.
 
 4
 On April 4, 1981, Willie Watson kidnapped Kathy Newman, a third-year medical student at Tulane University, from the parking lot of her apartment in the uptown university section of New Orleans. Watson was armed with a .38 caliber handgun allegedly designed, manufactured, and marketed by Charter Arms Corp. He forced Newman to drive to an isolated area in St. Charles Parish where he robbed her of her jewelry and raped her. Watson then instructed Newman to dress herself, and as she did so he shot her in the back of the head, killing her. Watson later confessed to the murder and stated that he shot Newman because he feared that she could identify him. The jury found Watson guilty of first degree murder, and he was sentenced to death.[2]
 
 
 5
 Judie Richman, Newman's mother, brought suit against Charter Arms in three federal district courts for the wrongful death of her daughter. The cases were consolidated in the Eastern District of Louisiana. The complaints alleged that the murder weapon
 
 
 6
 was designed, manufactured, and marketed by Defendant in a defective condition unreasonably dangerous to consumers, bystanders, and the general public, because the risk of [foreseeable] harm associated with marketing the product, as designed, to the general public, greatly outweighs any socially acceptable utility, if any.... Therefore, Charter Arms Corporation is "strictly liable" to Plaintiff.
 
 
 7
 Richman v. Charter Arms Corp., E.D.La.1983, 571 F.Supp. 192, 194. The district court interpreted this statement in the complaint to allege that the defendant was liable to the plaintiff either on a traditional products liability theory or on an ultrahazardous activity theory. Id. The court ruled that "the plaintiff has no basis for recovery under the Louisiana law of products liability", id. at 198, but denied the defendant's motion for summary judgment under the ultrahazardous activity theory. In reaching its decision on the ultrahazardous activity theory, the court applied the factors listed as pertinent in the Restatement (Second) of Torts Secs. 519-520 (1977), and found that there were issues of material fact under several of those factors sufficient to "prevent[ ] the Court at this point from telling the plaintiff that she is without a legal remedy". Id. at 209.
 
 
 8
 The district judge immediately certified all questions of law in his ruling to this Court under 28 U.S.C. Sec. 1292(b),[3] and issued an order to stay the proceedings pending the appeal. We granted the defendant's petition to appeal. On October 4, 1984, we issued a per curiam opinion finding that these consolidated cases "present undecided issues of Louisiana state law that will be determinative of the causes independently of the issues in each case". Perkins v. F.I.E. Corp., 5 Cir.1984, 743 F.2d 262. We certified the following issues to the Louisiana Supreme Court under La.Rev.Stat.Ann. Title 13 Sec. 72.1:
 
 
 9
 1. Does the manufacture, sale, and marketing of handguns constitute an ultrahazardous activity giving rise to absolute or strict liability of the manufacturer under Louisiana law? See Kent v. Gulf States Utilities Company, 418 So.2d 493, 498 (La.1982).
 
 
 10
 2. Is a handgun an unreasonably dangerous product when marketed to the general public, giving rise to strict product liability of the manufacturer under Louisiana law? See Hunt v. City Stores, Inc., 387 So.2d 585, 589 (La.1980).
 
 
 11
 3. Even if the answer to either of the questions is in the affirmative, will the use, including the criminal misuse, of the handgun by an ultimate possessor that injures a victim be regarded as a superseding cause, although allegedly foreseeable; or, instead, will it be regarded as an actionable consequence of the release of the product into the stream of commerce?
 
 
 12
 743 F.2d at 265. On November 26, 1984, the Louisiana Supreme Court, with two Justices dissenting, declined to accept certification. Perkins v. F.I.E. Corp., La.1984, 460 So.2d 1039.
 
 
 13
 We now turn to the question whether the plaintiffs state a cause of action against the manufacturers of the handguns under either a products liability theory or an ultrahazardous activity theory. The parties agree that Louisiana law governs this case. Because the issues are the same in both of the cases that have been consolidated for this appeal, we shall not treat the arguments of the various plaintiffs and defendants separately, but shall simply refer collectively to the "plaintiffs" or the "defendants" when discussing arguments on a particular side of a given issue. Moreover, because there was no written opinion issued in No. 83-3451, all references to the "district court's opinion" shall mean the opinion issued in No. 83-3591, Richman v. Charter Arms Corp., E.D.La.1983, 571 F.Supp. 192.
 
 
 14
 II. THE DOCTRINE OF ULTRAHAZARDOUS ACTIVITIES UNDER LOUISIANA LAW
 
 
 15
 The development of the law of ultrahazardous activities in Louisiana jurisprudence cannot be characterized as clear and unambiguous. Our task of determining the contours of that doctrine has been made more difficult by the fact that decisions in the federal courts applying Louisiana law are not always consistent with civilian methodology. The result is a series of decisions that do not share a readily identifiable common underlying conceptual structure. We now review the development of the doctrine and set forth our conclusions concerning its scope.
 
 
 16
 A. The Roots of the Doctrine: Articles 667-669
 
 
 17
 The phrase "ultrahazardous activity" did not appear in Louisiana case law until fairly recently. The Louisiana version of the "doctrine of ultrahazardous activity" has its roots in a series of decisions under La.Civ.Code arts. 667-669, which are set forth in the margin.[4] These articles establish certain limitations on the scope and extent of the right of ownership in immovable (real) property. Yiannopoulos, Civil Responsibility in the Framework of Vicinage: Articles 667-69 and 2315 of the Civil Code, 48 Tul.L.Rev. 195, 202 (1974). The redactors of the Civil Code characterized them as "legal servitudes", i.e., predial servitudes[5] imposed by law. "Legal servitudes are limitations on ownership established by law for the benefit of the general public or for the benefit of particular persons." La.Civ.Code art. 659 (West 1980). Articles 667-669 are an expression of the sic utere[6] doctrine that limits the rights of proprietors in the use of their property.[7] Accordingly, they impose obligations broader than the obligations arising from a servitude in the usual sense of that term.[8]
 
 
 18
 Many decisions have imposed liability under art. 667 for damage resulting from dangerous activities that would qualify as "ultrahazardous activities" under common law.[9] All of the activities, however, for which liability has been imposed under art. 667 originated in a landowner or custodian's use or abuse of land or immovable property in such a way as to cause injury to another person. All of these cases are consonant with the sic utere principle limiting the rights of proprietors or custodians of things in the use of their land. For example, plaintiffs have been held to have a cause of action under art. 667 for damage to neighboring persons or property resulting from chemical emissions from an industrial plant,[10] the building of a dangerous high pressure gas line within 15 feet of adjoining property,[11] heavy construction activities,[12] pile driving,[13] herbicide spraying,[14] and blasting operations.[15] Conversely, where there was no such activity being carried on by the defendant that gave rise to the plaintiff's injury, art. 667 has been found inapplicable.[16] Article 667 expresses a doctrine of strict liability that does not depend upon negligence or wilfulness.[17]
 
 
 19
 It is not surprising that the Louisiana doctrine of ultrahazardous activities takes its roots in art. 667 liability for dangerous activities relating to land[18] just as in the common law the doctrine of ultrahazardous activities also evolved out of the use of land.[19] This common law doctrine goes back to the well-known case, Rylands v. Fletcher,[20] imposing liability for the construction of a water reservoir that allowed water to break through into the adjoining mine shafts of the plaintiff.[21] The conditions and activities to which the Rylands rule has been applied in common law jurisdictions in this country have all involved land-related activities that caused damage to neighbors.[22]
 
 
 20
 Because art. 667 liability is confined to activities on land, it has no direct applicability to the present case. The landmark case of Langlois v. Allied Chemical Corp.,[23] however, demonstrates that liability for ultrahazardous activities is not confined strictly to art. 667. We now turn to a consideration of that case and the developments leading up to it.
 
 
 21
 B. The Langlois Case: Liability Under art. 2315 By Analogy to Other Civil Code Articles
 
 
 22
 The conceptual transformation in the law of ultrahazardous activities began with the case of Reymond v. State, 1970, 255 La. 425, 231 So.2d 375, a case which was repudiated by the Louisiana Supreme Court a year-and-a-half later in a case handed down the same day as Langlois.[24] In Reymond, the plaintiff brought an action for structural damage and diminution in value to her property resulting from heavy construction activities in conjunction with the building of a state highway near her residence. The trial and circuit courts awarded damages under art. 667. The Supreme Court, per Justice Barham, reversed, and held that art. 667 "is applicable only to structural changes in or on the land, and it is the existence of the thing, the construction, or the change upon the estate which must give rise to the damage". Id. 231 So.2d at 381 (emphasis added). The Court ruled that, because art. 667 "is a law of property and is inapplicable to the activities of man", id. 231 So.2d at 382 (emphasis added), the plaintiff could not recover under that article.
 
 
 23
 The Court, aware that many earlier cases had imposed strict liability under art. 667[25] upon one who engaged in activities on his property to the damage of his neighbor, stated:
 
 
 24
 We do not overrule the jurisprudence which has allowed recovery for damages resulting from the use of dangerous instrumentalities and materials or man's engagement in inherently hazardous activities. We simply find Article 667 inapplicable in such situations. We need not and do not state the basis, authority, or source for recovery in cases of this nature.
 
 
 25
 Id. 231 So.2d at 383. Justice Barham's use of the phrase "inherently hazardous activities" marked the first time that phrase had ever appeared in an opinion of the Louisiana Supreme Court.[26]
 
 
 26
 Justice Barham's opinion was hailed by Professor Wex Malone, a distinguished authority on Louisiana tort law, as a "commendable and important step in the right direction toward an intelligent and discriminate handling of enterprise liability for hazardous undertakings". Malone, Work of Appellate Courts--1969-1970: Torts, 31 La.L.Rev. 231, 239 (1971). Professor Malone argued that art. 667, being a rule of property, not of tort, did not lend itself well to the purpose of deciding which harms and annoyances should be accepted by society without recourse, and which enterprises should be made to bear liability for their activities without qualification. Id. at 240-41. He noted the Court's explicit recognition of the importance of the exclusion of harmful activity from the reach of art. 667 and its statement that earlier jurisprudence finding liability for those activities was not being overruled, and concluded that "[t]he decision thus clears the path for resort to a newly formulated body of doctrine leading to enterprise liability"[27] Id. at 244. Professor Malone suggested that enterprise liability should be founded directly upon the basic codal language, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ.Code art. 2315(A) (West Supp.1985). He argued that the term "fault" under that article need not be restricted to negligent or intentional misconduct. Id. at 245.[28]
 
 
 27
 A year and a half after Reymond was decided, the Louisiana Supreme Court had the opportunity to reexamine the scope of arts. 667 and 668 of the Civil Code. In Chaney v. Travelers Ins. Co., 1971, 259 La. 1, 249 So.2d 181, the plaintiff brought an action against parish authorities to recover damages to his residence, alleging that heavy construction activities undertaken for the improvement of a canal by the parish produced vibrations that caused cracks in the sheetrock of his home. The defendant argued that arts. 667 and 668 were inapplicable when activities, rather than constructions, caused damage to neighbors. The Court, in a scholarly opinion by Justice Summers, repudiated the narrow interpretation of arts. 667 and 668 in the Reymond decision and restored to these articles their broad historical meaning, which includes damage caused by activities as well as by structural changes on neighboring property. Yiannopoulos, Civil Responsibility in the Framework of Vicinage: Articles 667-69 and 2315 of the Civil Code, 48 Tul.L.Rev. 195, 222. Chaneytherefore restored arts. 667 and 668 as furnishing one basis for liability for land-related ultrahazardous activities that fall within the reach of those articles.
 
 
 28
 On the same day that Chaney was decided, the Louisiana Supreme Court also handed down the landmark decision of Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133 (Barham, J.), a decision which carried on the conceptual transformation in the law of ultrahazardous activities. In Langlois, the Court "expanded the concept of fault in article 2315 to include responsibility for ultrahazardous activities without negligence, namely, responsibility based on the notion of risk". Yiannopoulos at 222. The plaintiff in Langlois, a fireman, filed suit for personal injuries sustained from inhalation of a poisonous gas that escaped from the defendant's plant and drifted over to neighboring property where the plaintiff was working. Although the storage of a poisonous gas would probably have fitted easily within the pre-Reymond interpretation of art. 667, the Court noted that there was "inconsistence in jurisprudential assignment of a legal basis for allowing recovery for damages resulting from the dangerous and harmful activities and enterprises". 249 So.2d at 136.
 
 
 29
 The Court then described the general civilian methodology for determining when one person's conduct which does harm to another is of such a nature that the actor must respond in damages:
 
 
 30
 [I]n the decision of a case in tort or delict in Louisiana, the court first goes to that fountainhead of responsibility, Articles 2315 and 2316, and in applying those articles it goes to the many other articles in our Code as well as statutes and other laws which deal with the responsibility of certain persons, the responsibility in certain relationships, and the responsibility which arises due to certain types of activities.
 
 
 31
 Id. 249 So.2d at 137. Following these general principles, "liability for dangerous and hazardous activities of man flows from Civil Code Article 2315 by analogy with other Civil Code Articles". Id. 249 So.2d at 139. The Court then ruled that the defendant had injured the plaintiff by its "fault" as analogized from the conduct required under art. 669,[29] and the defendant was therefore liable to the plaintiff under art. 2315. Id. 249 So.2d at 140. The Court noted that the storage of the poisonous gas "was an ultra-hazardous activity, and the possible consequences of the gas escaping and causing harm were known or should have been known".[30] Id. 249 So.2d at 139.
 
 
 32
 The Court summarized its methodology in a passage that has spawned much confusion in later cases and in the present case, as we shall discuss more fully later:
 
 
 33
 We do not here establish a new standard for liability, but merely apply the standard set by law and applied repeatedly in our jurisprudence. The activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations.
 
 
 34
 Id. 249 So.2d at 140.
 
 
 35
 Langlois represented a conceptual breakthrough in the law of ultrahazardous activities, holding that delictual responsibility for such activities may be imposed under art. 2315, by analogy with other articles of the Civil Code. Before Langlois, as we have noted, responsibility was imposed primarily under property law through arts. 667 and 668. Langlois, however, raised the question of the interrelationship of arts. 2315, 667, and 668, because it was issued on the same day as Chaney, which reestablished the jurisprudence that imposed responsibility for many ultrahazardous activities under arts. 667 and 668.
 
 
 36
 Professor Yiannopoulos, highly regarded authority on Louisiana law, concluded that, even after Langlois, art. 2315 and arts. 667 and 668, although they overlap in part, establish distinct grounds of responsibility.[31] He argued that, under any particular set of facts, a plaintiff might have two distinct causes of action for a single recovery, or he might have a cause of action under one theory but not the other. In particular, "[s]ince ultrahazardous activities now give rise to a cause of action under article 2315, reliance on articles 667-668 in such cases may be unnecessary. But articles 667 and 668 do not impose responsibility for ultrahazardous activities only, and their aspect of responsibility without negligence may furnish the sole basis of recovery in cases in which there is no fault under article 2315." Yiannopoulos, Civil Responsibility in the Framework of Vicinage: Articles 667-69 and 2315 of the Civil Code, 48 Tul.L.Rev. 195, 223 (1974).
 
 
 37
 Later case law supports this interpretation of the interrelations of these articles. The Louisiana Supreme Court has noted that some activities may give rise to liability under both art. 667 and 2315, because a violation of art. 667 constitutes "fault" within the meaning of art. 2315. Dean v. Hercules, Inc., La.1976, 328 So.2d 69, 72.[32] One case implicitly held that art. 2315 and art. 667 constitute separate bases for liability for "extrahazardous activities". Russell v. Windsor Properties, Inc., La.Ct.App.1978, 366 So.2d 219, 223. Another case ruled that arts. 667 and 668 are not confined to liability for "ultrahazardous activities". Androwski v. Ole McDonald's Farms, Inc., La.Ct.App., 407 So.2d 455, 458, writ denied, La.1982, 409 So.2d 666. But see Lieber v. Rust, La.Ct.App.1980, 388 So.2d 836, 842, aff'd, La.1981, 398 So.2d 519, holding that "Article 667 has been limited by the jurisprudence to the conducting of ultrahazardous activities."
 
 
 38
 We thus conclude that, as of the time of the Langlois decision, liability under the doctrine of ultrahazardous activities could be based directly upon arts. 667 and 668--which are confined to activities relating to the use of land--or upon art. 2315 by analogy to other codal articles, such as art. 669, which was invoked in Langlois itself. We note that one of the most significant aspects of the doctrine as it had developed was that it was tied to specific codal articles, either directly or by analogy. The doctrine was not an "independent" legal theory like that of the common law doctrine of ultrahazardous activities under the Restatement (Second) of Torts Secs. 519-520.
 
 
 39
 This tying of liability to other codal articles through the concept of "fault" under art. 2315 was in keeping with the general "fault" scheme of the Civil Code.[33] Articles 2315 through 2324 comprise the Code's entire treatment of legal principle regulating offenses and quasi-offenses.[34] Article 2315 is the fountainhead of responsibility, and the "remaining articles constitute amplifications as to what constitutes 'fault' and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible." Loescher v. Parr, La.1975, 324 So.2d 441, 445 (Tate, J.).[35] The reference in Langlois by analogy to other codal articles outside of arts. 2316-2324 was therefore in keeping with this general methodology of imposing responsibility.
 
 
 40
 C. Later Development of the Doctrine: The Move Away From Specific Codal Articles
 
 
 41
 1. The Kent Case. During the years after Langlois and before the Louisiana Supreme Court's decision in Kent v. Gulf States Utilities Co., La.1982, 418 So.2d 493, several decisions in both the Louisiana Supreme Court and in the state circuit courts followed the conceptual structure established by Langlois and imposed liability for ultrahazardous activities under art. 2315 by analogy to art. 667.[36] In Kent, however, the Court seemed to cast liability for ultrahazardous activities directly upon art. 2315 alone, without relying, either directly or by analogy, on any other codal article.
 
 
 42
 The plaintiff in Kent sued for personal injuries resulting from contact with electric power lines owned by the defendant. The plaintiff sought to hold the defendant liable either on a theory of negligence for failing to take reasonable measures to protect against the foreseeable risk that a person would come in contact with the overhead conductors, which were in a construction area, or on a theory of strict liability, either as custodian of a "thing" under art. 2317[37] or as an "enterpriser engaged in an ultrahazardous activity". Id. at 496.
 
 
 43
 The Court began its analysis with the general rule that, because "fault" is a broader and more comprehensive term than "negligence", "the codal scheme imposes responsibility on a person not only when his negligence causes damage, but also when the person has a legal relationship with a person, a thing, or an activity which causes damage". Id. (citing Langlois ). For these activities, "[l]iability is strict in the sense that it does not depend upon proof of personal negligence". Id. The Court contrasted this "strict liability" with "absolute liability" for ultrahazardous activities:
 
 
 44
 Liability for ultrahazardous activities ... involves different considerations than liability under C.C. Art. 2317 for creating or maintaining a thing which presents an unreasonable risk of harm. There are some activities in which the risk may be altogether reasonable and still high enough that the party ought not undertake the activity without assuming the consequences. Such activities include pile driving, storage of toxic gas, blasting with explosives, crop dusting with airplanes, and the like, in which the activity can cause injury to others, even when conducted with the greatest prudence and care.
 
 
 45
 Id. at 498 (citations omitted). The Court stated that for these particular activities, Louisiana courts have imposed an absolute liability, as contrasted with the strict liability under art. 2317, "which virtually makes the enterpriser an insurer. The enterpriser, whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving damage and causation." Id.
 
 
 46
 In further elaborating on the kinds of activities subject to absolute liability, the Court stated that "[n]o decisions have placed in this category any activities in which the victim or a third person can reasonably be expected to be a contributing factor in the causation of damages with any degree of frequency". Id. at 499 n. 8. By contrast, the activity of driving piles, for which absolute liability has been imposed, is one that is likely to cause damage "even when there is no substandard conduct on anyone's part". Id. at 498. The Court concluded that, because the transmission of electricity "is an everyday occurrence" and when it results in injury, "it is almost always because of substandard conduct on the part of either the utility, the victim or a third party", the electric utility would not be held absolutely liable as an enterpriser engaged in ultrahazardous activities. Id. at 499.
 
 
 47
 We note that the Court in Kent did not explicitly rely, either directly or by analogy, on any particular codal article in its discussion of liability for ultrahazardous activities. One could nevertheless reasonably interpret Kent as not marking any departure from or innovation in the doctrine of ultrahazardous activities as viewed in Langlois, because all of the activities that the Court cited as illustrations of ultrahazardous activities were dangerous activities relating to land that fitted easily within the Langlois structure of liability under art. 2315 by analogy, in this case, to art. 667.[38]
 
 
 48
 2. The Ashland Oil Case. The district court in the present case, relying on Ashland Oil, Inc. v. Miller Oil Purchasing Co., 5 Cir.1982, 678 F.2d 1293, a case that was decided before Kent, applied the common law doctrine of ultrahazardous activities articulated in the Restatement (Second) of Torts Secs. 519-520 (1977). We now consider the Ashland Oil case to decide if it correctly states the Louisiana doctrine of ultrahazardous activities as it stands today, and we conclude that it does not. Accordingly, the district court's use of that case and the Restatement was erroneous.
 
 
 49
 In Ashland Oil, the plaintiff, an oil company, sought recovery of damages sustained in an explosion and fire at its refinery resulting from the injection into the plaintiff's oil pipeline of hazardous chemical waste products originally sold by one of the defendants, Rollins-Purle, Inc., to the persons injecting such chemicals. Rollins, the operator of an industrial waste disposal company in Baton Rouge, Louisiana, contracted with DuPont to dispose of waste chemical byproducts generated by DuPont. These byproducts were toxic, corrosive, malodorous, and pollutants of ground and surface water and plant and animal life. Rollins agreed with DuPont to dispose of the chemicals by incineration, but found that the corrosive effect of the wastes rendered the incinerator inoperable.
 
 
 50
 To maintain its lucrative business with DuPont, Rollins communicated with the defendant Larry Young and persuaded Young to dispose of the waste in such a manner that the waste could not be traced back to its original source. Rollins took additional precautions to ensure that the material, if discovered, would not be traced back to its Baton Rouge facility.[39] Young sold the material to Waco, Inc., a small family-owned oil reclaiming operation in the Natchez, Mississippi area. Waco sold the material to Miller Oil Purchasing Co., which then sold the material to Ashland Oil Purchasing, Inc., a subsidiary of the plaintiff, and injected the material into a pipeline owned by the plaintiff, from which the material found its way into the refinery and caused extensive damage. The district court found that Young either knew or should have known the true nature of the industrial waste he agreed to dispose of, and that by involving Young in the transaction with knowledge that Young would cause the waste eventually to be discharged into a crude oil pipeline, Rollins intended the consequence of its action.
 
 
 51
 The district court found that Rollins and Young were liable to the plaintiff on an ultrahazardous activity theory, and we affirmed on the basis of the district court's opinion, which we reproduced in an appendix to our decision. Ashland Oil, Inc. v. Miller Oil Purchasing Co., 5 Cir.1982, 678 F.2d 1293. To decide whether the defendants' activities fell under the Louisiana doctrine of ultrahazardous activities, the district court turned to the following passage in the Langlois case:
 
 
 52
 The activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations.
 
 
 53
 Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133, 140.
 
 
 54
 The district court took this passage to be a substantive rule listing the "factors" to be considered in deciding whether an activity should be labelled ultrahazardous under Louisiana law. The court then observed that, "[a]lthough reference was not made to Restatement, Torts, Second, Sec. 520, in Langlois, supra, the factors enumerated therein are strikingly similar".[40] 678 F.2d at 1307-08. The court then tersely concluded:
 
 
 55
 Applying the factors articulated by the Louisiana Supreme Court in Langlois and in Sec. 520 of the Restatement, Second, to the conduct of Rollins and Young, the Court is constrained to hold that the disposal of the [chemical wastes] by these defendants was an abnormally dangerous and ultrahazardous activity.
 
 
 56
 Id. at 1308.
 
 
 57
 We hold that Ashland Oil --even assuming its invocation of the common law doctrine of the Restatement was correct under Louisiana law at the time it was decided, a proposition about which we have serious doubt, as we shall discuss--does not reflect the current law of ultrahazardous activities in the light of the Louisiana Supreme Court's more recent decisions concerning that doctrine. Neither Kent nor the more recent discussion of ultrahazardous activities in Hebert v. Gulf States Utilities Co., La.1983, 426 So.2d 111, 114 n. 6, makes any reference to the Restatement.[41] Moreover, none of the decisions since Kent, in both the Louisiana appellate courts and in our Court, that have invoked or discussed the Louisiana doctrine of ultrahazardous activities (as opposed to strict liability in products liability cases) have applied or even mentioned the Restatement. See Smith v. Formica Corp., La.Ct.App.1983, 439 So.2d 1194; Buchanan v. Tangipahoa Parish Police Jury, La.Ct.App.1983, 426 So.2d 720; O'Neal v. International Paper Co., 5 Cir.1983, 715 F.2d 199; CNG Producing Co. v. Columbia Gulf Transmission, 5 Cir.1983, 709 F.2d 959.
 
 
 58
 Our conclusion that the district court erred in this case by invoking the Restatement doctrine of ultrahazardous activities is reinforced by the following considerations. Both the district court in the present case and the district court in Ashland Oil justified their invocation of the Restatement by pointing to the passage in Langlois that we have quoted earlier in this section listing various "factors" to be considered. Both courts took this passage to be a substantive rule for deciding what activities should be cast as "ultrahazardous" for invoking absolute liability, similar to the factors of the Restatement.
 
 
 59
 We conclude, for several reasons, that the quoted passage was not meant by the Louisiana Supreme Court to be a substantive rule of liability, but rather an expression of methodology. First, the Langlois decision itself, in the sentence immediately preceding the sentence containing the "factors", states, "We do not here establish a new standard for liability, but merely apply the standard set by law and applied repeatedly in our jurisprudence." Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133, 140. The passage enumerating the factors was meant to be an expression of the methodology to be used in deciding whether an activity that falls within the subject matter of a particular codal article should be held to be within the reach of that article's imposition of strict liability. In Langlois, the activity fell within the subject matter of art. 669, and the Court applied the listed factors in ruling that liability should attach under art. 2315, by analogy to art. 669.
 
 
 60
 A recent decision by the Louisiana Supreme Court confirms that the "factors passage" of Langlois is simply an expression of methodology. In Entrevia v. Hood, La.1983, 427 So.2d 1146, the Court was presented with the question whether the owner of a remote, unoccupied farm house, which was surrounded by a fence and posted with "no trespassing" signs, should be held strictly liable under art. 2317[42] for damages resulting when a trespasser was injured by the collapse of the building's rear steps. The facts of the case fell within the subject matter of art. 2317, because the defendant was the owner of a "thing"--the unoccupied farmhouse--which occasioned the damage, and the issue was whether strict liability should be imposed under that article. In a lengthy passage discussing the methodology by which the Court would decide whether liability should attach, the Court recited the "factors" listed in Langlois:
 
 
 61
 As this court has noted in relation to other forms of strict liability under the civil code, the activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. Langlois v. Allied Chemical Corporation, 258 La. 1067, 1084, 249 So.2d 133, 140 (1971).
 
 
 62
 427 So.2d at 1149 (emphasis added).
 
 
 63
 Moreover, the district court's lifting of a statement from a judicial opinion, untied to a codal article, and the taking of that statement as a new substantive rule of liability is not in keeping with civilian methodology. The Louisiana Supreme Court has made this quite clear in a passage that is directly applicable to the district court's opinion in this case:
 
 
 64
 In deciding the issue before us the lower courts did not follow the process of referring first to the code and other legislative sources but treated language from a judicial opinion as the primary source of law. This is an indication that the position of the decided case as an illustration of past experience and the theory of the individualization of decision have not been properly understood by our jurists in many instances. Therefore, it is important that we plainly state that, particularly in the changing field of delictual responsibility, the notion of stare decisis, derived as it is from the common law, should not be thought controlling in this state. The case law is invaluable as previous interpretation of the broad standard of Article 2315, but it is nevertheless secondary information.
 
 
 65
 Ardoin v. Hartford Accident & Indemnity Co., La.1978, 360 So.2d 1331, 1334.
 
 
 66
 We therefore conclude that neither the "factors passage" of Langlois nor the factors enumerated in the Restatement (Second) of Torts Secs. 519-520 (1977) comprise the Louisiana doctrine of ultrahazardous activities.[43]D. Summary and Application
 
 
 67
 Whether an activity qualifies as an ultrahazardous activity under Louisiana law is a question of law.[44] O'Neal v. International Paper Co., 5 Cir.1983, 715 F.2d 199, 201; Ashland Oil, Inc. v. Miller Oil Purchasing Co., 5 Cir.1982, 678 F.2d 1293, 1308; Touchstone v. G.B.Q. Corp., E.D.La.1984, 596 F.Supp. 805, 814. The activity alleged by the plaintiffs in the present cases to be ultrahazardous is the marketing of small handguns to the general public. We now summarize our review of the development of the Louisiana doctrine of ultrahazardous activities, set forth our conclusions concerning the scope of that doctrine, and apply the doctrine to the marketing of handguns. We hold that such marketing is not an ultrahazardous activity.
 
 
 68
 The Louisiana doctrine of ultrahazardous activities has its roots in arts. 667-669 of the Civil Code. All of the cases before Langlois[45] that imposed absolute liability involved dangerous activities relating to land or other immovables that were within the terms of those articles. Indeed, the term "ultrahazardous activity" did not appear in a Louisiana Supreme Court decision until the Reymond case,[46] decided just one year before Langlois. Langlois transformed the conceptual structure underlying the doctrine of ultrahazardous activities, and placed liability under art. 2315 by analogy to other codal articles, such as arts. 667-669. Several decisions after Langlois and before Kent[47] applied this conceptual structure and found liability for ultrahazardous activities under art. 2315 by analogy to other codal articles.
 
 
 69
 In Kent, the Louisiana Supreme Court seemed to place liability for ultrahazardous activities directly under art. 2315, without referring to any other codal articles by analogy. We believe that Kent is consistent with the conceptual structure of Langlois, because the activity under consideration--transmission of electric power--was a land-related activity falling within the subject matter of art. 667. Nevertheless, several decisions after Kent have discussed ultrahazardous activities without referring to other codal articles. Assuming, therefore, that liability can be imposed under art. 2315 without analogy to other codal articles,[48] our comprehensive review of the cases reveals that the doctrine is defined by the following boundaries:
 
 
 70
 1. The Activity Must Be An Activity Relating to Land or to Other Immovables. Without a single exception, every decision in the Louisiana Supreme Court and the appellate courts since Langlois imposing absolute liability, either under the conceptual structure of Langlois by analogy to other codal articles or under the label "ultrahazardous" without reference to other articles, involved an activity relating to immovables.[49] The marketing of handguns is not such an activity. Indeed, the only Louisiana decision we have found that is on point holds that the manufacturer of a consumer product cannot be held liable under an ultrahazardous activity theory. In Smith v. Formica Corp., La.Ct.App.1983, 439 So.2d 1194, the plaintiff was injured when the fumes of an extremely flammable contact adhesive came into contact with the pilot light of a hot water heater in a bathroom, causing a flash fire. The court ruled that "[w]e do not feel compelled in this case to ... adopt a rule of law that would impose absolute liability on a consumer products manufacturer. The Louisiana Supreme Court has reserved absolute liability for ultrahazardous activities (such as pile driving, storage of toxic gas, etc.)". Id. at 1200 (citing Kent ).
 
 
 71
 2. The Activity Itself Must Cause the Injury and the Defendant Must Have Been Engaged Directly in the Injury-Producing Activity. In each case where absolute liability has been imposed, the plaintiff's injury resulted directly from the ultrahazardous activity itself. For example, pile driving, blasting, or heavy construction activities caused structural damage to neighboring buildings, poisonous gas escaped and was inhaled by neighboring persons, or the crops of neighboring landowners were damaged by aerial spraying. Moreover, liability was imposed on the person using the instrument that occasioned the injury, not on the manufacturer of the piles, the explosives, or the heavy construction machinery.[50] By contrast, in the present case, the direct cause of the plaintiffs' injuries was not the marketing of handguns; the cause was the criminal misuse of those handguns by persons not agents or employees of the defendants. When the injury does not flow directly from the activity itself alleged to be ultrahazardous, liability does not attach under the Louisiana doctrine. See Deville v. Calcasieu Parish Gravity Drainage Dist., La.Ct.App.1982, 422 So.2d 631, 635, holding that the maintenance of a storm drain, into which the plaintiff fell, is not an ultrahazardous activity; Charia v. Stanley, La.Ct.App., 359 So.2d 291, 294, aff'd mem., La.1978, 362 So.2d 579, holding that "the operation of a so-called third-rate hotel", at which a mattress fire started that occasioned smoke and water damage to the plaintiff's property, is not an ultrahazardous activity.
 
 
 72
 3. The Activity Must Not Require the Substandard Conduct of a Third Party to Cause Injury. Louisiana law places in the ultrahazardous category activities that "can cause injury to others, even when conducted with the greatest prudence and care". Kent v. Gulf States Utilities Co., La.1982, 418 So.2d 493, 498. But "[n]o decisions have placed in this category any activities in which the victim or a third person can reasonably be expected to be a contributing factor in the causation of damages with any degree of frequency". Id. at 499 n. 8. In Kent, the Louisiana Supreme Court refused to classify the transmission of electric power as an ultrahazardous activity, because when electric transmission results in injury, "it is almost always because of substandard conduct on the part of either the utility, the victim or a third party". Id. at 499.
 
 
 73
 We recently applied this rule of Kent in CNG Producing Co. v. Columbia Gulf Transmission, 5 Cir.1983, 709 F.2d 959, in which we held that the venting of natural gas is not an ultrahazardous activity. Because "the activity of venting gas is likely to cause damage only when there is substandard conduct on someone's part", we concluded that "[w]e would not subject this activity to strict liability without certain directions from the Louisiana courts". Id. at 962. The same conclusion is compelled in the present case. The plaintiffs allege that the marketing of handguns to the general public is ultrahazardous, not because they frequently misfire, explode, or discharge unexpectedly, even under proper use, but because those handguns may fall into the hands of criminals. The kinds of injuries for which the plaintiffs seek to hold the defendants absolutely liable, therefore, are injuries that result from the "substandard"--here, criminal--conduct of unrelated third parties. The doctrine of ultrahazardous activities is therefore unavailable to the plaintiffs under Louisiana law.[51]
 
 E. Conclusion
 
 74
 The marketing of handguns to the general public falls far beyond the boundaries of the Louisiana doctrine of ultrahazardous activities. It is not a land-related activity, and the injuries of which the plaintiffs complain were not caused by the marketing itself, but rather resulted only when there was substandard conduct on the part of third parties. We agree with the Seventh Circuit that a ruling that the marketing of handguns constitutes an ultrahazardous activity "would in practice drive manufacturers out of business" and "would produce a handgun ban by judicial fiat".[52] Martin v. Harrington & Richardson, 7 Cir.1984, 743 F.2d 1200, 1204. Regardless whether such a radical restructuring of economic relationships is appropriate for a court, rather than a legislature,[53] we are certain that it is inappropriate for a federal court sitting in a diversity case, bound by Louisiana law.
 
 
 75
 We recently faced a similar situation in Thompson v. Johns-Manville Sales Corp., 5 Cir.1983, 714 F.2d 581, cert. denied, 1984, --- U.S. ----, 104 S.Ct. 1598, 80 L.Ed.2d 129, in which the plaintiff sought injuries resulting from asbestosis and argued that we should adopt a rule of "enterprise" or "market share" liability that would dispense with the traditional causation requirement of tort law. What we said there is directly applicable to the present case:
 
 
 76
 [W]riting in diversity, we write on the wind. Louisiana will or will not adopt [the proposed theories] at some future time. In no reported case has it done so at present, nor have any substantial number of other jurisdictions. Both theories represent radical departures from traditional theories of tort liability. All that [the plaintiff] can advance in support of his claim that Louisiana would adopt either if presented his case is a supposed general tendency or trend on the part of Louisiana courts to expand the liability of manufacturers.
 
 
 77
 That is not enough to support our adoption for Louisiana of a particular and radical mode of its expansion. Such departures are for the Louisiana courts [or legislature], not for us.
 
 
 78
 Id. at 583.
 
 
 79
 Moreover, the logic of the plaintiffs' arguments is essentially without boundaries. Because liability for ultrahazardous activities is absolute under Louisiana law, liability under the doctrine "virtually makes the enterpriser an insurer". Kent v. Gulf States Utilities Co., La.1982, 418 So.2d 493, 498. If we were to classify the marketing of handguns as an ultrahazardous activity, handgun manufacturers might be liable, not only as insurers against every criminal misuse of a handgun, but also, for example, to the families of suicide victims, and to victims or their families who were shot by homeowners in legitimate self defense or mistakenly shot by hunters or the police. There is also nothing inherent in the logic of the plaintiffs' arguments that would prevent their application to the manufacturers of any instrumentality that can be used dangerously, such as knives, lead pipes, explosives, automobiles, alcohol, and rolling pins. Indeed, most consumer products marketed to the general public have both legitimate and harmful uses. We cannot accept the argument that the manufacturer should become an insurer of all uses of those products, both legitimate and illegitimate, simply by virtue of having marketed them.
 
 III. LOUISIANA PRODUCTS LIABILITY LAW
 
 80
 In defining "fault" under art. 2315 for purposes of products liability law, the Louisiana Supreme Court has ruled that "[a] manufacturer of a product which involves a risk of injury to the user is liable to any person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated." Weber v. Fidelity & Casualty Ins. Co., 1971, 259 La. 599, 250 So.2d 754, 755 (Tate, J.). To recover under the rule of Weber, a plaintiff has the burden of proving " that the product was defective, i.e., unreasonably dangerous to normal use; that the product was in normal use at the time the injury occurred; that the product's defect caused the injury; and that the injury might reasonably have been anticipated by the manufacturer". Hunt v. City Stores, Inc., La.1980, 387 So.2d 585, 589. If the product is proved defective by reason of its hazard to normal use, the plaintiff need not prove any negligence in the manufacture of the article, because the manufacturer is presumed to know of the vices in the things it makes. Weber, 250 So.2d at 756. "Louisiana's law in the products liability area has been described by commentators as closely approximating that of common law states following the Restatement (Second) of Torts Sec. 402A."[54] DeBattista v. Argonaut-Southwest Ins. Co., La.1981, 403 So.2d 26, 30, cert. denied, 1982, 459 U.S. 836, 103 S.Ct. 82, 74 L.Ed.2d 78.[55] See also Bell v. Jet Wheel Blast, La.1985, 462 So.2d 166, 171.
 
 
 81
 In DeBattista, the Louisiana Supreme Court defined "unreasonably dangerous" to mean "simply that the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer". 403 So.2d at 30. The district court applied this "consumer expectation test"[56] and ruled that, as a matter of law, the plaintiffs could not recover under a products liability theory in this case, because "[e]very consumer doubtless knows that [a handgun] can be used as a murder weapon". Richman v. Charter Arms Corp., E.D.La.1983, 571 F.Supp. 192, 197. The district court noted that the consumer expectation test normally applies in cases where the defendant has failed to attach an adequate warning to its product, but held that "it would be unreasonable to say that a death might have been averted had the [defendant] attached an adequate warning to each of its handguns explaining how the product can be used and abused". Id. The court concluded that "such warnings are not likely either to alter consumer buying behavior or to reduce handgun violence". Id. We find the district court's conclusions under this test unassailable.[57]
 
 
 82
 The plaintiffs argue, however, that the consumer expectation test is not the only test of defectiveness under Louisiana law, and that we should apply instead the "risk/utility test" of Hunt v. City Stores, Inc., La.1980, 387 So.2d 585. In that case the Louisiana Supreme Court stated that, in deciding whether a product is unreasonably dangerous to normal use, "a balancing test is mandated: if the likelihood and gravity of harm outweigh the benefits and utility of the manufactured product, the product is unreasonably dangerous". Id. at 589. The plaintiffs assert that this test is more appropriate than a consumer expectation test for cases of this kind, in which the injured party is not the consumer of the product. The plaintiffs conclude that they were entitled to have a jury perform the risk/utility analysis, and that the district court therefore erred in dismissing their products liability claim as a matter of law.
 
 
 83
 We do not agree. The plaintiffs read the scope of the Hunt rule too broadly. In that case a twelve year old boy was descending an escalator in a shopping center in New Orleans when his right tennis shoe got caught in the space between the moving tread and the escalator's left side panel, resulting in damage to both knees. No one was able to determine why the boy's shoe lodged in the escalator. The Louisiana Supreme Court imposed strict products liability on the manufacturer of the escalator because "the risk of harm was known to [the manufacturer] but not obvious to the public". 387 So.2d at 589.[58] This latent danger gave rise to a duty to warn, and the Court found that "[d]espite knowledge of the danger present to children in tennis shoes, [the manufacturer] had not warned of that hazard". Id. Accordingly, the Court concluded that the lower courts had erred in dismissing the claims against the manufacturer.
 
 
 84
 Although the Court spoke in terms of a risk/utility test, the analysis it actually applied was that of the consumer expectation test and its attendant duty-to-warn rule. Moreover, the escalator had something "wrong" with it--it would grab tennis shoes in the moving treads. Therefore, even if the Court's stated, rather than its applied, rule of liability went beyond the consumer expectation test, its invocation of that rule was used to decide whether an admittedly faulty escalator should be deemed "unreasonably dangerous". This invocation of the risk/utility analysis is consistent with the majority view that "there must be 'something wrong' with a product before risk/utility analysis may be applied". Note, Handguns and Products Liability, 97 Harv.L.Rev. 1912, 1915 (1984).[59] In the present case, unlike the escalator, the handguns operated precisely as they were designed to do; there was nothing "wrong" with them in a functional sense.
 
 
 85
 Our conclusion concerning the boundaries of the risk/utility test is confirmed by the case law invoking that test. In every case since Hunt in both the Louisiana appellate courts and in the Fifth Circuit in which the Louisiana risk/utility test has been applied, the product as marketed had something wrong with it that allowed it to function in a way that was not intended. See Jowers v. Commercial Union Ins. Co., La.Ct.App.1983, 435 So.2d 575 (ready-mix concrete containing no warning that it could cause severe burns if allowed to contact the skin); Pawlak v. Brown, La.Ct.App., 430 So.2d 1346, writ denied, La.1983, 439 So.2d 1072 (three wheel motorcycle with no warning that it could be accelerated, in addition to the throttle-valve on the right handlebar, by pulling on the throttle cable running from the throttle to the carburetor); Lovell v. Earl Grissmer Co., Inc., La.Ct.App.1982, 422 So.2d 1344, writ denied, La.1983, 427 So.2d 871 (machine for cleaning bricks on a home which had a short power cord, thus necessitating use of possibly ungrounded extension cords which could cause electrocution from water buildup in the connection between the cords); Brown v. Link Belt Div. of FMC Corp., 5 Cir.1982, 666 F.2d 110 (offshore oil platform crane used to lower personnel to a ship; possibility of crane cable unwinding rapidly during descent and erratic motion of ship, causing passenger basket to crash into deck of the ship); Schneider v. Eli Lilly & Co., E.D.La.1983, 556 F.Supp. 809 (ingestion of diethystilbestrol (DES) during pregnancy, causing clear cell adenocarcinoma in offspring).[60]
 
 
 86
 The plaintiffs insisted at oral argument that the small size of the handguns at issue in these cases, which allows them to be readily concealed as weapons by members of the general public to whom they are marketed, is the feature that should be subjected to a risk/utility analysis to decide whether the handguns should be labelled "defective" or "unreasonably dangerous". But the small size of the handgun, rather than being something wrong in the design, even when the gun is marketed indiscriminately to the public, is more properly characterized as a central attribute of the design. At bottom, then, what the plaintiffs seek is a ruling that it is sufficient to hold a manufacturer strictly liable if the design of the product causes injury, rather than a defect in the product. The plaintiffs argue that, since the adoption of the risk/utility test in products liability, it is no longer true that a "defect" means that something is "broken" or "designed wrong". Under the plaintiffs' view of the risk/utility test, any product, whether or not it has something wrong with it that allows it to malfunction or cause unintended results, can be subjected to a general balancing test by a jury of the risk of harm resulting when the product is used in a foreseeable manner--either correctly, negligently, or criminally--against the benefits of the product.
 
 
 87
 Some support for the plaintiffs' proposed open-ended balancing test may be found in the California Supreme Court's 1978 decision in Barker v. Lull Engineering Co.[61] In that case the plaintiff was operating a loader on a steep slope to move lumber to the second floor of a building under construction when the load shifted and a piece of lumber fell from the machine onto him. The California Supreme Court reversed the trial court's instruction, which stated that a consumer expectation test was to be applied in deciding whether a product is "unreasonably dangerous", and held that a product may be found "defective" under either a consumer expectation test or a broad risk/utility test:
 
 
 88
 [I]n design defect cases, a court may properly instruct a jury that a product is defective in design if (1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.[62]
 
 
 89
 Under the Barker test, the plaintiff must first prove that the product's design (rather than a "defect") proximately caused the injury. The burden of going forward then shifts to the defendant to prove that the benefits of the product's design outweigh its risks of danger. If the jury decides that the benefits do not outweigh the risks, the product is labelled "defective" and the manufacturer is held strictly liable for injuries caused by the design.[63] The Barker test thus reverses the order of proof of causation and defectiveness. Under traditional products liability law, defectiveness is adjudged first, then causation is determined. Under Barker, causation must be proved first, then defectiveness is adjudged. Barker also gives a significant tactical advantage to plaintiffs by shifting the burden of the risk/utility analysis to the defendant.
 
 
 90
 The Barker test arguably[64] provides the plaintiffs a vehicle for the remedy they seek, because under that test, to get to the jury, the plaintiffs need make only "a prima facie showing that the injury was proximately caused by the product's design ".[65] In view of the intervening criminal acts in these cases, the plaintiffs would still face a major hurdle in showing that the small size of the handgun, even when coupled with the fact of their unrestricted sale to the public, was the proximate cause of their injuries.[66] But the plaintiffs would be relieved of showing that there was "something wrong" in a functional sense with the handguns at issue.[67]
 
 
 91
 Whatever the merits of the Barker rule may be,[68] it plainly is not the law in Louisiana. No court in this jurisdiction has ever applied a general risk/utility analysis to a well-made product that functioned precisely as it was designed to do. The plaintiffs have not alleged that the handguns in these cases had something wrong with them--such as a safety mechanism that fails under certain circumstances, a tendency to misfire, or a trigger structure that can get caught on foreign objects and cause the gun to discharge unexpectedly--that would bring the risk/utility analysis of Hunt into play. All they have alleged is that the guns were small and consequently could be concealed, a design attribute that is true of a host of consumer products. We therefore conclude that as a matter of law the plaintiffs cannot recover under Louisiana products liability law, either under the consumer expectation test, or the risk/utility test.
 
 IV. CONCLUSION
 
 92
 The marketing of handguns to the general public falls far beyond the boundaries of the Louisiana doctrine of ultrahazardous activities. It is not an activity related to land or other immovables, and the injuries of which the plaintiffs complain were not caused by the marketing itself, but rather result only when there is substandard conduct on the part of third parties. Whether an activity should be classed as "ultrahazardous" is a question of law, and we hold that the plaintiffs in this case cannot recover under that theory.
 
 
 93
 The plaintiffs have not alleged that there was anything functionally wrong with the handguns causing the injuries in these cases. Because the guns functioned precisely as they were designed, and because the dangers of handguns are obvious and well-known to all members of the consuming public, we hold that the plaintiffs cannot recover, as a matter of law, under Louisiana products liability law, either under the consumer expectation test of DeBattista, or under the risk/utility test of Hunt.
 
 
 94
 We AFFIRM the grant of summary judgment in favor of the defendant F.I.E. Corp. in No. 83-3451. We REVERSE the decision in No. 83-3591 and REMAND with instructions to enter summary judgment in favor of the defendant Charter Arms Corp.
 
 
 
 [1]
 Discussion of the legal theories under which plaintiffs might seek recovery from the manufacturers of handguns for injuries caused by criminal misuse of handguns may be found in Note, Handguns and Products Liability, 97 Harv.L.Rev. 1912 (1984) [cited as Harvard Note]; Note, Legal Limits of a Handgun Manufacturer's Liability for the Criminal Acts of Third Persons, 49 Mo.L.Rev. 830 (1984) [cited as Note, Legal Limits ]; Santarelli & Calio, Turning the Gun on Tort Law: Aiming at Courts to Take Products Liability to the Limit, 14 St. Mary's L.J. 471 (1983); Note, Manufacturers' Strict Liability for Injuries From a Well-Made Handgun, 24 Wm. & Mary L.Rev. 467 (1983) [cited as Note, A Well-Made Handgun ]; Note, Manufacturers' Liability to Victims of Handgun Crime: A Common-Law Approach, 51 Fordham L.Rev. 771 (1983) [cited as Note, A Common-Law Approach ]; Turley, Manufacturers' and Suppliers' Liability to Handgun Victims, 10 N.Ky.L.Rev. 41 (1982)
 
 
 [2]
 The jury recommended the death sentence because it found aggravating circumstances, including a significant history of criminal activity. On Watson's direct appeal of his conviction and sentence, the Louisiana Supreme Court affirmed the conviction, but reversed the sentence of death because of an erroneous jury instruction given by the trial court. State v. Watson, La.1982, 423 So.2d 1130. After remand for a new sentencing hearing, the jury again recommended the death sentence, and the Louisiana Supreme Court affirmed. State v. Watson, La.1984, 449 So.2d 1321, cert. denied, 1985, --- U.S. ----, 105 S.Ct. 939, 83 L.Ed.2d 952. Watson then sought state habeas corpus relief. His applications were denied summarily by the state trial court without an evidentiary hearing, and by the Louisiana Supreme Court. Watson then filed for habeas corpus relief in federal court, alleging that certain jurors were improperly disqualified for cause and that his sentence was determined in accordance with an unconstitutionally vague statute. The district court rejected Watson's contentions, and we affirmed. Watson v. Blackburn, 5 Cir.1985, 756 F.2d 1055
 
 
 [3]
 That section provides:
 When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order....
 28 U.S.C. Sec. 1292(b) (1982).
 
 
 [4]
 Article 667 provides:
 Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
 La.Civ.Code art. 667 (West 1980).
 Article 668 provides:
 Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
 Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.
 La.Civ.Code art. 668 (West 1980).
 Article 669 provides:
 If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.
 La.Civ.Code art. 669 (West 1980).
 These three articles, which have no counterpart in the French Civil Code, derive from the text of J. Domat, Les Lois Civiles dans leur Ordre Naturel, Book II, tit. VIII, Section 3, No. 9, 1 Oeuvres de Domat 333-34 (Remy ed. 1828); 1 Domat, The Civil Law In Its Natural Order 611-16 (Strahan Trans.Bost.1853), Yiannopoulos, Civil Responsibility in the Framework of Vicinage: Articles 667-69 and 2315 of the Civil Code, 48 Tul.L.Rev. 195, 201 (1974); Dean v. Hercules, Inc., La.1976, 328 So.2d 69, 71; Reymond v. State, 1970, 255 La. 425, 231 So.2d 375, 380-81. Articles 667 and 668 establish reciprocal rights and duties of neighboring landowners, in accordance with the civilian concept of abuse of right. Article 669 is similar to common law nuisance, proscribing insufferable inconveniences in which the harm suffered outweighs the social utility of the activity causing inconvenience. Schexnayder v. Bunge Corp., 5 Cir.1975, 508 F.2d 1069, 1075; Yiannopoulos, at 216-20.
 
 
 [5]
 "A predial servitude is a charge on a servient estate for the benefit of a dominant estate." La.Civ.Code art. 646 (West 1980)
 
 
 [6]
 The sic utere doctrine is an embodiment of the maxim "sic utere tuo, ut alienum non laedas"--"use your own property in such a manner as not to injure that of another"
 
 
 [7]
 Dean v. Hercules, Inc., La.1976, 328 So.2d 69, 72; Hero Lands Co. v. Texaco, Inc., La.1975, 310 So.2d 93, 97; Lombard v. Sewerage & Water Bd., La.1973, 284 So.2d 905, 912; Chaney v. Travelers Ins. Co., La.1971, 251 La. 1, 249 So.2d 181, 186
 
 
 [8]
 Dean v. Hercules, Inc., La.1976, 328 So.2d 69, 72; Yiannopoulos, note 4, at 203
 
 
 [9]
 The common law of ultrahazardous or abnormally dangerous activities is stated in the Restatement (Second) of Torts Secs. 519-520 (1977):
 
 
 [519]
 General Principle
 (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
 (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
 
 
 [520]
 Abnormally Dangerous Activities
 In determining whether an activity is abnormally dangerous, the following factors are to be considered:
 (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
 (b) likelihood that the harm that results from it will be great;
 (c) inability to eliminate the risk by the exercise of reasonable care;
 (d) extent to which the activity is not a matter of common usage;
 (e) inappropriateness of the activity to the place where it is carried on; and
 (f) extent to which its value to the community is outweighed by its dangerous attributes.
 The First Restatement of Torts used the term "ultrahazardous activity" in defining strict liability for engaging in a dangerous activity. The Second Restatement of Torts, without any substantial change in judicial decisions, recast the doctrine in an attempt to combine Prosser's original ideas concerning "non-natural" and "extraordinary uses" of land. W. Prosser & W. Keeton, Prosser and Keeton on Torts Sec. 78, at 555 (5th ed. 1984) [cited as Prosser and Keeton]. The Second Restatement employs the term "abnormally dangerous activities". Many courts have used the labels interchangeably, and we agree that "[t]he choice between the labels 'ultrahazardous' and 'abnormally dangerous' is not too important". Id. at 555-56.
 
 
 [10]
 Dean v. Hercules, Inc., La.1976, 328 So.2d 69
 
 
 [11]
 Hero Lands Co. v. Texaco, Inc., La.1975, 310 So.2d 93
 
 
 [12]
 Lombard v. Sewerage & Water Bd., La.1973, 284 So.2d 905; Chaney v. Travelers Ins. Co., 1971, 259 La. 1, 249 So.2d 181
 
 
 [13]
 Craig v. Montelepre Realty Co., 1968, 252 La. 502, 211 So.2d 627; D'Albora v. Tulane Univ., La.Ct.App., 274 So.2d 825, aff'd mem., La.1973, 278 So.2d 504, 505; Gulf Ins. Co. v. Employers Liability Assurance Corp., La.Ct.App.1965, 170 So.2d 125; Bruno v. Employers Liability Assurance Corp., La.Ct.App.1953, 67 So.2d 920
 
 
 [14]
 Gotreaux v. Gary, 1957, 232 La. 373, 94 So.2d 293
 
 
 [15]
 Fontenot v. Magnolia Petroleum Corp., 1955, 227 La. 866, 80 So.2d 845; Wright v. Superior Oil Co., La.Ct.App.1962, 138 So.2d 688; Pate v. Western Geophysical Co., La.Ct.App.1956, 91 So.2d 431
 
 
 [16]
 Boudreaux v. American Ins. Co., 1972, 262 La. 721, 264 So.2d 621
 
 
 [17]
 E.g., Hero Lands Co. v. Texaco, Inc., La.1975, 310 So.2d 93, 97; Chaney v. Travelers Ins. Co., 1971, 259 La. 1, 249 So.2d 181, 186. Earlier decisions characterized the liability under art. 667 as "absolute" because liability was imposed even without a showing of negligence or fault. E.g., Craig v. Montelepre Realty Co., 1968, 252 La. 502, 211 So.2d 627, 632; Gotreaux v. Gary, 1957, 232 La. 373, 94 So.2d 293, 295; Fontenot v. Magnolia Petroleum Co., 1955, 227 La. 866, 80 So.2d 845, 849. As we discuss later, the label "absolute liability" is now applied in Louisiana jurisprudence only to those activities which are found to be "ultrahazardous activities"
 
 
 [18]
 Cf. O'Neal v. International Paper Co., 5 Cir.1983, 715 F.2d 199, 201 n. 2 ("[The plaintiff] claimed La.Civ.Code art. 667 as an additional basis for liability. This article, however, simply recasts the liability for ultrahazardous activity.")
 
 
 [19]
 For convenience, in referring to land we include immovables; for example, buildings and component parts of land. See La.Civ.Code arts. 462-470 (West 1980)
 
 
 [20]
 Fletcher v. Rylands, 1865, 3 H. & C. 774, 159 Eng.Rep. 737, rev'd, 1866, L.R. 1 Ex. 265, aff'd, 1868, L.R. 3 H.L. 330
 
 
 [21]
 Prosser & Keeton, note 9, Sec. 78, at 545
 
 
 [22]
 See Prosser & Keeton, note 9, Sec. 78, at 549-50
 
 
 [23]
 Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133
 
 
 [24]
 See Chaney v. Travelers Ins. Co., 1971, 259 La. 1, 249 So.2d 181
 
 
 [25]
 The Court also noted that earlier decisions had not been consistent in stating the basis upon which a plaintiff might recover damages for acts upon property by his neighbor:
 The courts of this state have floundered from one theory to another to no theory at all in determining the right to recover for damages caused to neighboring property by a hazardous or unusual activity or by the use of a dangerous instrumentality or material. Recovery has been predicated upon negligence, upon a common law theory of nuisance, upon the common law theory of strict liability when one engages in hazardous activity, and upon the theory of limitation of right of ownership, and has even been allowed without a mentioned theory or authority.
 
 
 [231]
 So.2d at 380
 
 
 [26]
 Our research has located only one Louisiana appellate court decision before Reymond that used a similar phrase as a term of art. In Town of Jackson v. Mounger Motors, La.Ct.App.1957, 98 So.2d 697 (Tate, J.), the court stated that art. 667 is an embodiment of the sic utere doctrine. The court noted in dictum that "[t]he Restatement of Torts limits the application of the [sic utere ] doctrine to an 'ultrahazardous activity' of the defendant which 'is not a matter of common usage', Restatement of Torts, Sections 519, 520." Id. at 699. The court then concluded that "[t]he evidence does not reflect a use of its property by defendant ... so inherently dangerous or foreseeably likely to cause harm to others as to justify application of the 'sic utere' doctrine." Id. (emphasis added)
 
 
 [27]
 Justice Barham confirmed Professor Malone's conclusion concerning Reymond in his opinion concurring in the result in Chaney v. Travelers Ins. Co., 1971, 259 La. 1, 249 So.2d 181, the case that repudiated Reymond's holding that art. 667 applies only to structural changes on land that damage neighbors. In Chaney, Justice Barham wrote, "Reymond was simply the beginning of an attempt to establish a rational basis upon which we could, without distortion of the codal provisions, determine the liability in cases involving inherently dangerous constructions and ultra-hazardous activities." Id. 249 So.2d at 188 (Barham, J., concurring in the result)
 
 
 [28]
 The term, fault, can be regarded as sufficiently expansive to meet the needs of our complex and dangerous society. The term is properly applicable to the enterpriser who undertakes an activity which he knows in advance involves a high degree of risk to society even after all reasonable precautions have been taken. This risk is inherent in the enterprise undertaking itself, and for creating it the enterpriser can appropriately be made to answer. This is his compact with society. It is the price he pays for the privilege of undertaking the enterprise. The act of launching a dangerous business or operation in the face of a certain although unavoidable chance of injury to the public can appropriately be characterized as "fault," even though society tolerates and even encourages the activity as so conducted
 
 
 [31]
 La.L.Rev. at 245
 Fault is not defined in the Louisiana Civil Code, nor is it defined in the French Civil Code, apparently in order to keep the concept fluid. Howe equates the term with unlawful conduct. W. Howe, Studies in the Civil Law 194 (1896). For a discussion of the civilian approach in Louisiana and France, see Stone, Louisiana Tort Doctrine: The Concept of Fault, 27 Tul.L.Rev. 1 (1953); Stone, Tort Doctrine in Louisiana: The Agressor Doctrine, 21 Tul.L.Rev. 362 (1947); Stone, Tort Doctrine in Louisiana: The Materials For the Decision of a Case, 17 Tul.L.Rev. 159 (1942); Stone, Tort Doctrine in Louisiana: From What Sources Does It Derive?, 16 Tul.L.Rev. 489 (1942).
 
 
 [29]
 Article 669 provides, "If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place." La.Civ.Code art. 669 (West 1980)
 
 
 [30]
 In a footnote to this sentence, the Court stated: "The states under common law have recognized that, in ultra-hazardous activities such as this, liability is imposed in the absence of negligence. Prosser, Torts (3rd ed. 1964), Sec. 77; Restatement, Torts Sec. 519 (1938); Restatement, Torts 2d (Tent.Draft No. 10 1964), Secs. 519-520; Malone, 31 La.L.Rev. 231." 249 So.2d at 139 n. 13. The district court in the present case concluded from this sentence that Louisiana has adopted the doctrine of ultrahazardous activities as defined in the Restatement (Second) of Torts Secs. 519-520. This conclusion was erroneous, as we discuss later in this opinion
 
 
 [31]
 "Article 2315 establishes responsibility under the law of delictual obligations for all injuries to persons and property. Articles 667 and 668 establish specifically responsibility for damage to property and persons in the context of neighborhood, namely, under rules of property law." Yiannopoulos, note 4, at 223
 
 
 [32]
 Accord Dixon v. Gutnecht, La.Ct.App.1976, 339 So.2d 1285, 1289, aff'd mem., La.1977, 342 So.2d 673; Holland v. Keaveney, La.Ct.App., 306 So.2d 838, 841, aff'd mem., La.1975, 310 So.2d 843; Schexnayder v. Bunge Corp., 5 Cir.1975, 508 F.2d 1069, 1071
 
 
 [33]
 See generally Stone, Louisiana Tort Doctrine: The Concept of Fault, 27 Tul.L.Rev. 1 (1953); Stone, Tort Doctrine in Louisiana: The Materials For the Decision of a Case, 17 Tul.L.Rev. 159 (1942)
 
 
 [34]
 The Louisiana Code follows the French Code in not defining delit (offense) and quasi-delit (quasi offense). Pothier's definition is: "On appellee delit le fait par lequel une personne, par dol ou malignite, cause du dommage ou quelque tort a un autre. Le quasi-delit est le fait par lequel une personne, sans malignite, mais par une imprudence qui n'est pas excusable, cause quelque tort a un autre." Pothier, Traite des obligations I No. 116, at 158 (1821). "Injury (delictum ) is when a person by fraud or malignity causes any damage or wrong to another. p Quasi delicta, are facts by which a person causes damages to another, without malignity, but by some inexcusable imprudence." Pothier On Obligation 164 (Evans trans. 1853). "[Quasi-Delicts] They were all of praetorian origin and do not appear as a separate class of obligations prior to the time of Justinian.... Quasi delicts were actionable wrongs which were not included in the list of delicts covered by the statutory actions of the jus civile. They were moreover, wrongs not resulting from the malice of the offender, but rather from his fault, ignorance, or negligence." Burdick, Principles of Roman Law and Their Relation to Modern Law 505 (1938). See generally Buckland, A Manual of Roman Private Law 331 (2d ed. 1953); Buckland, A Treatise on Roman Law 589 (2d ed. 1932); Radin, Roman Law 159 (1927); Howe, Studies in the Civil Law 191-217 (1896); Note, Offenses and Quasi-Offenses, 26 Tul.L.Rev. 394, 394-96 (1952); Oppenheim, Survival of Tort Actions and the Action For Wrongful Death: A Survey and a Proposal, 16 Tul.L.Rev. 386, 402 (1942)
 
 
 [35]
 In Loescher the plaintiff's car was damaged when a rotten tree owned by the defendant fell on top of it. The court found the defendant liable under art. 2317, see note 37, holding that the custodian of a thing which creates an unreasonable risk of harm is liable, without proof of negligence, based upon the owner/custodian's legal relationship to the thing causing the damage
 
 
 [36]
 See Dean v. Hercules, Inc., La.1976, 328 So.2d 69; Russell v. Windsor Properties, Inc., La.Ct.App.1978, 366 So.2d 219; Holland v. Keaveney, La.Ct.App., 306 So.2d 838, aff'd mem., La.1975, 310 So.2d 843; D'Albora v. Tulane Univ., La.Ct.App., 274 So.2d 825, aff'd mem., La.1973, 278 So.2d 504, 505
 
 
 [37]
 Article 2317 provides, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." La.Civ.Code art. 2317 (West 1979)
 
 
 [38]
 Kent is, however, inconsistent with Loescher, if it does not in terms overrule the earlier decision. Kent now requires that to recover under art. 2317 the plaintiff must prove not only that the condition of the thing causing injury posed an unreasonable risk, but that there was also a failure of the defendant to take reasonable care to prevent it getting into a condition that could cause injury. Note, Developments in the Law: 1981-1982, Torts, 43 La.L.Rev. 607 (1982); Note, A Redefinition of Strict Liability Under Article 2317, 28 Loy.L.Rev. (New Orleans) 1209 (1982)
 
 
 [39]
 In its dealings with Young, Rollins deviated from its usual business practices. It prepared no invoices, did not object to Young's failure to pay for the bulk of the waste, allocated the payments it did receive from Young to petty cash, and recorded none of the transactions with Young on its books
 
 
 [40]
 The district court in the present case went further than the Ashland Oil court and concluded that the Langlois court had referred to the Restatement provisions "to support its reliance on the rule" consisting of the listed "factors". Richman v. Charter Arms Corp., E.D.La.1983, 571 F.Supp. 192, 201. This conclusion is clearly incorrect. The Langlois court, rather than citing the Restatement for support, merely made the observation that common law jurisdictions have also recognized that liability without negligence can be imposed upon persons engaged in ultrahazardous activities, citing the Restatement as one example. Specifically, the Langlois court said: "The states under common law have recognized that, in ultra-hazardous activities such as this, liability is imposed in the absence of negligence. Prosser, Torts (3rd ed. 1964), Sec. 77; Restatement, Torts Sec. 519 (1938); Restatement, Torts 2d (Tent.Draft No. 10 1964), Secs. 519-520; Malone, 31 La.L.Rev. 231." Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133, 139 n. 13
 
 
 [41]
 In the most recent case of Hampton v. Rubicon Chemicals, Inc., La.1984, 458 So.2d 1260, 1274 (opinion on rehearing), the Court stated in dictum that there was a "strong implication" that the defendant's storage of poisonous phosgene gas was an ultrahazardous activity. The Court cited Langlois, and no reference was made to the Restatement. Id
 
 
 [42]
 See note 37
 
 
 [43]
 Cf. Note, Legal Limits, note 1, at 845 ("The court [in Richman ] disregarded Erie by relying on the Restatement (Second) of Torts, an approach the Louisiana Supreme Court has never taken.")
 Even if Secs. 519-520 of the Restatement (Second) of Torts were applicable, it appears that the defendants could not be held liable under those sections. The text of those sections is reproduced in note 9. The comments to Sec. 519 demonstrate that the marketing of a consumer product is not within the purview of the kinds of activities that section was meant to encompass. In particular, comment d states that "liability arises out of the abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity". Restatement (Second) of Torts Sec. 519 comment d (1977) (emphasis added). Thus, Sec. 519 encompasses activities that are dangerous in and of themselves and that can directly cause harm to those "in the vicinity", even though conducted with "the utmost care to prevent the harm". Id. The storage of dynamite in a city is one paradigm given in comment e. The marketing of a handgun is not dangerous in and of itself, and when injury occurs, it is not the direct result of the sale itself, but rather the result of actions taken by a third party.
 Nor is the marketing of handguns properly classified as abnormally dangerous under the factors of Sec. 520. With respect to factors (a) (existence of a high degree of risk) and (b) (likelihood that the harm resulting will be great), although the use of handguns may involve a high degree of risk and a likelihood of great harm, it is the marketing of handguns that is alleged to be abnormally dangerous. As we have noted, the risks of harm from handguns do not come from their sale and distribution as such.
 The district court in the present case missed this distinction between use and marketing when it applied factor (d) (extent to which the activity is a matter of common usage). The court stated that "[h]andguns are not an item of 'general use '; they are an item of extraordinary or abnormal use". Richman v. Charter Arms Corp., E.D.La.1983, 571 F.Supp. 191, 202 (emphasis added). From this the court concluded that it could not hold that "the operation of handguns" is a "matter of common usage". Id. (emphasis added). The proper issue, however, is whether the marketing of handguns is a matter of common usage. "In light of the fact that approximately two million handguns are sold each year, the manufacture and sale of handguns are unquestionably 'of common usage.' " Harvard Note, note 1, at 1923. To return to the paradigm case of explosives, although the storage of explosives is an abnormally dangerous activity under comment e of Sec. 519, we are not aware of any case holding that the marketing of explosives is an abnormally dangerous activity.
 Finally, with respect to factor (f) (extent to which value to the community of the activity is outweighed by its dangers), the district court correctly concluded that the Louisiana "legislature, by not banning handguns sales to the general public, either by statute or by constitutional amendment, has indicated that it thinks the social utility of the defendant's marketing practices is at least as great as the social disutility of those practices". 571 F.Supp. at 202.
 Every decision in common law jurisdictions of which we are aware has held that the manufacture and sale of handguns to the general public does not constitute an ultrahazardous activity. See Martin v. Harrington & Richardson, Inc., 7 Cir.1984, 743 F.2d 1200; Patterson v. Rohm Gesellschaft, N.D.Tex.1985, 608 F.Supp. 1206 [1985]; Fiella v. Bangor Punta Corp., No. 756 of 1984 (Pa.C.P. Beaver County Feb. 7, 1985); Moore v. R.G. Industries, No. C-82-1417-MHR (N.D.Cal. Aug. 29, 1984); Mavilia v. Stoeger Indus., D.Mass.1983, 574 F.Supp. 107; Riordan v. International Armament Corp., No. 81 L 27923 (Pa.Cir.Ct. Cook County July 21, 1983), aff'd, Ill.Ct.App.1985, 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 [1985]; Francis v. Diamond Int'l Corp., Nos. CV82-11-1279 & CV83-02-0215 (Ohio C.P. Butler County Mar. 22, 1983).
 
 
 [44]
 The district court refused to decide whether the classification of an activity as ultrahazardous is a question of law, stating only that "[w]hether the decision about how to classify the defendant's activities is for the Court or a jury to make is an issue to be resolved at some future date". Richman v. Charter Arms Corp., E.D.La.1983, 571 F.Supp. 192, 204 n. 14. The court cited four cases, two in this circuit applying Louisiana law, and two from state supreme courts. The two state cases squarely hold that the question is one of law, and in both federal cases the court, not a jury, decided the question. The district court's refusal to decide the issue is made more puzzling by the fact that the court concluded that Sec. 520 of the Restatement was the applicable substantive rule of classification, and comment l to that section clearly states, "Whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in this Section...." Restatement (Second) of Torts Sec. 520 comment l (1977)
 
 
 [45]
 Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133
 
 
 [46]
 Reymond v. State, 1970, 255 La. 425, 231 So.2d 375
 
 
 [47]
 Kent v. Gulf States Utilities Co., La.1982, 418 So.2d 493
 
 
 [48]
 The plaintiffs have pointed to no codal article aside from art. 2315 the subject matter of which would encompass the marketing of handguns. Outside of arts. 667 and 668, liability without proof of negligence has been imposed under arts. 2317 (liability for acts caused by persons or things in our custody for which we are responsible), 2318 (liability for the acts of minors for whom we are responsible), 2320 (liability for the acts of our servants, students or apprentices), 2321 (liability for damage caused by animals owned by us), and 2322 (liability for damage caused by the ruin of a building owned by us). Northern v. Department of Streets, La.Ct.App., 455 So.2d 1288, 1289, aff'd mem., La.1984, 460 So.2d 605. The marketing of handguns plainly does not fall within the subject matter of any of these articles. Therefore, if Kent preserves the conceptual structure of Langlois, the marketing of handguns cannot qualify as an ultrahazardous activity under Louisiana law
 
 
 [49]
 See Hampton v. Rubicon Chemicals, Inc., La.1984, 458 So.2d 1260, 1274 (storage of poisonous gas); Dean v. Hercules, Inc., La.1976, 328 So.2d 69, 72 (chemical emissions from defendant's industrial plant); Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133, 139 (storage of poisonous gas); Price v. State, La.Ct.App.1984, 451 So.2d 644, 646-47 (blasting); Rosenblath v. Louisiana Bank & Trust Co., La.Ct.App.1983, 432 So.2d 285, 288 (demolition activities); Russell v. Windsor Properties, Inc., La.Ct.App.1978, 366 So.2d 219, 223 (aerial spraying); D'Albora v. Tulane Univ., La.Ct.App., 274 So.2d 825, 829, aff'd mem., La.1973, 278 So.2d 504, 505 (pile driving). Cf. Holland v. Keaveney, La.Ct.App., 306 So.2d 838, 842, aff'd mem., La.1975, 310 So.2d 843, holding that, although demolition is an ultrahazardous activity, the defendant was not liable to the plaintiff for the loss of a rare dog which occurred when a swarm of bees stung the dog to death after the wall in which their nests were located was leveled during demolition, because such a loss was "not anticipated as a natural consequence" of the ultrahazardous undertaking
 
 
 [50]
 See Note, Legal Limits, note 1, at 846. The same has been true in common law jurisdictions as well. See Harvard Note, note 1, at 1923-24
 [The Louisiana cases] suggest that a product must be joined with a particular use of the product before any ultrahazardous activity is created. Handguns, like explosives and deadly gases, are subject to a variety of uses, and the magnitude of risk occasioned by a handgun significantly depends on which use its owner selects. Whether based on policy considerations of fairness or accident prevention, liability should remain with the entity or individual utilizing the handgun rather than be shifted back to the gun manufacturer.
 Note, Legal Limits, note 1, at 846. Cf. Moore v. R.G. Industries, Inc., No. C-82-1417-MHP, slip op. at 7 (N.D.Cal. Aug. 29, 1984) (holding that, given California cases rejecting claims that the discharge of firearms or inadequate supervision of their use constitutes an ultrahazardous activity, "it is difficult to see how a California court could hold that the manufacture and marketing of handguns, far less proximately related to the occurrence of any injury than discharge, could constitute engagement in an ultrahazardous activity").
 
 
 [51]
 Cf. Bianchini v. Humble Pipe Line Co., 5 Cir.1973, 480 F.2d 251, 254, holding that Louisiana would not impose liability under an ultrahazardous activity theory where "the calamity was caused solely by a superseding and intervening event"
 
 
 [52]
 Indeed, many of the plaintiffs' lawyers who have brought suits of this nature have publicly stated that one of their main goals in pursuing these cases is to effect handgun control through the courts, bypassing the political pressures of the legislative process. See Harvard Note, note 1, at 1925 n. 78; Santarelli & Calio, note 1, at 474
 
 
 [53]
 See Harvard Note, note 1, at 1924-27; Santarelli & Calio, note 1, at 505-06
 
 
 [54]
 See also Robertson, Manufacturers' Liability for Defective Products in Louisiana Law, 50 Tul.L.Rev. 50, 54 (1975) (observing that Weber's beginning statement of Louisiana defective products law is functionally similar to Sec. 402A). Section 402A of the Restatement provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 Restatement (Second) of Torts Sec. 402A (1965).
 
 
 [55]
 The Court also observed that "[t]he history of strict liability in Louisiana indicates the requirement that a defective product must be 'unreasonably dangerous' came into our jurisprudence due to the pervasive influence of section 402A of the Restatement (Second) of Torts after its publication in 1965." 403 So.2d at 30
 
 
 [56]
 The definition of "unreasonably dangerous" in DeBattista, with its focus on the consumer's expectations, is virtually the same as the Restatement's definition of "unreasonably dangerous": "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics". Restatement (Second) of Torts Sec. 402A comment i (1965). A majority of common law jurisdictions follow some variation of Sec. 402A and the consumer expectation test. Note, A Well-Made Handgun, note 1, at 481
 Weber's consumer-oriented definition of defect under products liability law parallels the buyer-oriented definition of a redhibitory defect under the Civil Code: "Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice". La.Civ.Code art. 2520 (West 1952). One commentator concludes that the Weber and Code constructions of "defect" are "functionally equivalent". Robertson, note 54, at 90.
 
 
 [57]
 The defendants argued to the district court that the plaintiffs had also failed to satisfy the second element of the Hunt formulation because the handgun was not in normal use at the time Kathy Newman was killed. The district court rejected this argument, relying principally on this Court's decision in LeBouef v. Goodyear Tire & Rubber Co., 5 Cir.1980, 623 F.2d 985, which held the manufacturer of a Cougar sports car strictly liable for injuries and death resulting when the tread separated from the body of one of the tires on the car. At the time of the accident, the car was being driven by a highly intoxicated driver at speeds in excess of 100 m.p.h. We noted that, under Louisiana law, "normal use" includes all "reasonably foreseeable" uses of the product. We held that, because the Cougar was marketed with an intended and recognized appeal to youthful drivers, with a 425 horsepower engine providing a capability of speeds over 100 m.p.h., it was "to be readily expected" that the car would be driven in excess of the 85 m.p.h. proven maximum safe operating speed of the tires on the car. Id. at 989. We therefore concluded that the manufacturer could not escape its duty either to provide an adequate warning of the specific danger of tread separation at such high speeds or to ameliorate the danger in some other way. Id
 The district court concluded from LeBouef that "if car manufacturers must reasonably expect purchasers of their products to speed periodically, then surely handgun manufacturers must reasonably expect purchasers of their products to kill periodically", and therefore ruled that "in the context of this case the criminal use of a handgun is, as a matter of law, a normal use of that product". 571 F.Supp. at 197.
 We believe that the district court made too much of LeBouef. In LeBouef, the foreseeable misuse of the product gave rise to a duty to warn of the danger of the tread separation. 623 F.2d at 989; see Bradco Oil & Gas Co. v. Youngstown Sheet & Tube Co., 5 Cir.1976, 532 F.2d 501, cert. denied, 1977, 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542. The manufacturer's failure to warn was therefore sufficient to impose liability under the consumer expectation test. Moreover, given the foreseeable misuse of a sports car capable of speeds in excess of 100 m.p.h., the provision without a warning of tires rated for only 85 m.p.h. rendered the sports car "defective" even in the most traditional sense of the term. By contrast, in the case of handguns, as the district court held, the dangers of handguns are so commonly known that no warning is required.
 A majority of cases in common law jurisdictions that have considered the foreseeability of criminal misuse of firearms have found that such criminal activity is not reasonably foreseeable, or, equivalently, constitutes a superseding cause of injury. See Martin v. Harrington & Richardson, Inc., 7 Cir.1984, 743 F.2d 1200, 1205; Note, A Well-Made Handgun, note 1, at 493-97; Note, A Common-Law Approach, note 1, at 795-96. In the light of our holding that handguns are not unreasonably dangerous as a matter of law under the first prong of the Hunt test, we need not decide whether the criminal misuse of a handgun is not a "normal use" within the meaning of the second prong of the Hunt test.
 
 
 [58]
 The manufacturer's engineer admitted that the escalator industry had experience with the problem of children's tennis shoes getting caught. 387 So.2d at 589
 
 
 [59]
 The risk/utility test was developed for situations in which it is difficult to determine whether a product should be labelled "defective". See Harvard Note, note 1, at 1915-16. For example, Ford Pintos were designed with the gasoline tank near the rear bumper. Under the risk/utility test, "[i]f placing the tank in the center of the car would reduce the chances of fire in rear-end collisions without creating other risks, significantly reducing performance, or significantly increasing costs, then the risk of the rear-end design outweighs its utility, and the car is defective". Id. at 1914. One commentator concludes that "[a] test designed for marginal or doubtful cases should not be used to support the conclusion that there is a defect in a product that is obviously doing what it is supposed to do." Id. at 1916
 
 
 [60]
 One Louisiana appellate court concluded that the "shift [in DeBattista ] to a customer expectation approach for determining defectiveness impliedly rejects the prior balancing test of Hunt...." LeRay v. Saint Paul Fire & Marine Ins. Co., La.Ct.App.1983, 444 So.2d 1252, writ granted, La., 448 So.2d 108, dismissed as moot, La.1984, 452 So.2d 1174
 
 
 [61]
 20 Cal.3d 413, 573 P.2d 443, 143 Cal.Rptr. 225
 
 
 [62]
 Id. at 429, 573 P.2d at 453, 143 Cal.Rptr. at 234 (emphasis added). The Court held that the factors to be considered in the risk/utility balancing include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and consumer that would result from an alternative design". Id. at 431, 573 P.2d at 455, 143 Cal.Rptr. at 237
 
 
 [63]
 Note, A Well-Made Handgun, note 1, at 486
 
 
 [64]
 There is language in the Barker opinion itself suggesting that even the test enunciated therein would not reach as far as the plaintiffs in this case desire. The Court stated that its test "subjects a manufacturer to liability whenever there is something 'wrong' with its product's design--either because the product fails to meet ordinary consumer expectations as to safety or because, on balance, the design is not as safe as it should be--while stopping short of making the manufacturer an insurer for all injuries which may result from the use of its product ". 20 Cal.3d at 432, 573 P.2d at 456, 143 Cal.Rptr. at 238 (emphasis added). One case held that handgun manufacturers could not be liable as a matter of law under Ohio products liability law, which adopts the Barker approach, see note 68. See Francis v. Diamond Int'l Corp., Nos. CV82-11-1279 & CV83-02-0215 (Ohio C.P. Butler County Mar. 22, 1983)
 In response to Barker, the California legislature passed an act that added Sec. 1714.4 to the Civil Code, which provides:
 (a) In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged.
 (b) For purposes of this section:
 (1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design.
 (2) Injuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product.
 (c) This section shall not affect a products liability cause of action based upon the improper selection of design alternatives.
 (d) This section is declaratory of existing law.
 Cal.Civ.Code Sec. 1714.4 (West Supp.1985).
 
 
 [65]
 Barker, 20 Cal.3d at 431, 573 P.2d at 455, 143 Cal.Rptr. at 237 (emphasis added)
 
 
 [66]
 See Note, A Well-Made Handgun, note 1, at 490-97
 
 
 [67]
 "The traditional [products liability] rule ... searches for a defect-injury causative link while Barker requires a design-injury link." Id. at 493
 
 
 [68]
 The Barker approach has been adopted either expressly or implicitly in Alaska, Ohio, and Florida. It has been rejected in Colorado, West Virginia, Washington, and Kansas. New York and Texas use variations of the risk/utility test, but retain the requirement that the plaintiffs prove the product to be unreasonably dangerous before it can be found defective. See id. at 486-87
 One primary misgiving we have with the Barker approach is that it apparently requires a case-by-case adjudication of whether the utility of a particular product, even functioning properly, outweighs its risk of harm. This method, as applied to handguns, for example, could easily breed blatantly inconsistent results, because the utility of the product is, in a sense, being weighed "in the abstract" by different juries who, although facing virtually identical facts, may reach opposite conclusions. The two cases before us provide an illustration. Both involved small, readily concealable handguns that were criminally misused to injure innocent victims. In both cases the guns functioned exactly as they were designed to. In one case, a jury might conclude that the small size and attendant concealability of the gun caused its risks to outweigh its utility. In the other case, even though the same model of handgun might be at issue, the jury might conclude that the utility of the handgun outweighs the risks attendant to its size.
 The rule, therefore, at least as applied to products that have not malfunctioned or manifested something "wrong" with them, fails to provide any framework for reaching consistent decisions as applied to identical products under similar circumstances. The jury is, in effect, allowed to legislate in each particular case whether the manufacturer of a well-made product should insure its use. Cf. Francis v. Diamond Int'l Corp., Nos. CV82-11-1279 & CV83-02-0215, slip op. at 4 (Ohio C.P. Butler County Mar. 22, 1983):
 The weighing test should only be applied where the product could be made safer with an alternative design, and not where the product is in itself dangerous. If such a cause of action was allowed, it would permit the Jury to speculate on whether a product should be produced at all--that the product in its present state is so dangerous that it should not be on the market, or if it is on the market, the manufacturer should be liable for any injuries incurred by the use of the handgun.... The jury should not be able to speculate on whether handguns are beneficial to society; that is a policy matter for the legislature to decide.