William A. HAMMOND, III, a minor, by his next friend, Susan F. HAMMOND, William A. Hammond, Jr., and Susan F. Hammond, individually, Plaintiffs,

v.

COLT INDUSTRIES OPERATING CORP., a Delaware corporation, Defendant.

Superior Court of Delaware, New Castle County.

Submitted: April 12, 1989.
Decided: June 23, 1989.

Harold Schmittinger, William D. Fletcher, Jr., of Schmittinger & Rodriguez, P.A., for plaintiffs.

Paul Bradley, McCarter & English, for defendant.

## MEMORANDUM OPINION

DEL PESCO, Judge.

This is a product liability action filed against Colt Industries Operating Corp. ("Colt") alleging that a single-action .22 caliber revolver manufactured by Colt was defectively designed because it did not include a modern safety. The gun in question has a primitive safety feature, however, plaintiffs allege that an additional modern safety was necessary. Defendant admits that the gun did not have a modern safety because it was manufactured as a replica of a 19th Century gun that was designed when appropriate safety mechanisms were not in existence and the gun manufacturer wanted to protect the integrity of the design.

Colt has filed the present motion requesting summary judgment on all counts of the complaint on the grounds that there is no genuine issue of material fact for presentation to a jury. Colt also requests that Count II of the complaint be dismissed for failure to state a claim upon which relief can be granted because it is based on strict liability. For the reasons stated below, Colt's motion for summary judgment is DENIED and the motion to dismiss Count II is GRANTED.

## MOTION FOR SUMMARY JUDGMENT

The facts viewed in a light most favorable to plaintiffs are as follows: On June 29, 1983 Hayward Allen Murray ("Murray"), age 13, shot plaintiff William A. Hammond, III ("Hammond"), in the head with the .22 caliber gun manufactured by Colt. Murray testified that he took the gun from his closet, took a bullet from the dining room of his home and placed it in the chamber of the gun. He then took the gun outside, fired it in the back yard, emptied the spent shell and reentered his home. At that point he went into the living room where other children were watching TV. Murray and two other children, Eddie and Donnie, checked the cylinder of the gun for bullets and found none. They began to play Russian roulette with the gun. Murray testified that he understands that you play Russian roulette by putting a bullet in the gun, spinning the chamber, putting the gun to your head and pulling the trigger. He stated that he wanted to do everything that you do in Russian roulette except having a bullet in the gun. Murray doesn't recall if he pointed the gun at anyone else or at the TV. He stated that after they played Russian roulette, he was spinning the gun on his finger when it went off and shot Hammond.

Murray testified that he was aware of only two ways that the gun could be fired. One way was to pull the hammer all the way back and pull the trigger. In addition, although he never actually discharged a bullet this way, he thought it would fire if you pulled the trigger back, kept it back and pulled the hammer about halfway back. He would not have expected the gun to fire if you first pulled the hammer back halfway and then pulled the trigger. He believed this half cocked position was a safe position.

Murray testified that when he was twirling the gun, the hammer was in the complete down (closed) position.

Murray also testified that he had used his father's shotguns before which had safeties on them. His father told him what a safety was for and that it should be left on until he was ready to fire the gun. He testified that he understands that a safety should be left on until you are ready to fire so that the gun does not go off accidentally. His father never showed him a safety on the Colt .22.

Plaintiffs' expert, Lama Martin, testified that the gun was defectively designed because it does not have a modern internal automatic safety or an external manual safety. He stated that the primitive notch safety on the gun offers some margin of safety, but does not prevent the gun from accidentally discharging when the gun is dropped or when the trigger of the gun is inadvertently pulled.

Martin's report explains that the gun was designed to be fired by first cocking the hammer to the full cock position and pulling the trigger. He states that most users think that this is the only way the

gun can be fired. However, Martin's report details four additional ways by which it is possible to fire the gun: 1) by trigger pull when the hammer is in the half cock notch; 2) by trigger pull when the hammer is in the load or safe notch; 3) by thumb slip when cocking or uncocking the hammer; 4) by a blow to the hammer when the hammer is in the half cock notch or when it is full forward resting on the firing pin. He acknowledged that each possibility requires the trigger to be pulled. Based on Murray's testimony that he did not cock the hammer and pull the trigger, the expert believes that the most likely possibility was by thumb slip. He states that Murray may have been twirling the gun and somehow snagged the hammer and pulled it back part way while holding the trigger. In the alternative, Murray could have been fanning the gun while twirling it (pushing the hammer back part way and releasing it).

Martin opines that the failure to incorporate either an internal automatic safety to prevent drop firing or an external manual safety which, when engaged, would prevent any type of firing makes this gun defective because it will easily fire in ways not known to the user. While Martin acknowledged that an automatic internal safety would probably not have prevented this accident, he testified that a manual safety would have prevented it if such a safety had been engaged. He testified that manual safeties can be disengaged or not used as a matter of individual habit.

In support of its motion for summary judgment, Colt argues that: 1) the gun was not defectively designed; 2) plaintiff has failed to establish that the alleged defect in the gun was the proximate cause of Hammond's injuries; and 3) Murray's conduct constitutes an intervening and superseding cause.

■ Summary judgment is appropriate where, viewing the record in a light most favorable to the nonmoving party, there is insufficient evidence to lead a rational trier of fact to find for the nonmoving party. *Celotex Corp. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Stear-*

*rett v. Newcomb*, Del.Super., C.A. No. 83C–SE–74, 1988 WL 77660 Del Pesco, J. (July 20, 1988) (Mem.Op.). Where the nonmoving party bears the ultimate burden of proof, summary judgment may be granted if the moving party can demonstrate a complete failure of proof concerning an essential element of the nonmoving party's case. *Id.* "In such a situation there can be 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–323, 106 S.Ct. at 2553, 91 L.Ed.2d at 273.

■ First, defendant argues that plaintiffs are unable to demonstrate the existence of any defect in the gun. See *Windle v. Clark Equipment Co.*, Del.Supr., 373 A.2d 571 (1977) (In a product liability action plaintiff must produce evidence that a defect existed in a particular product at the time of the accident). Defendant contends that plaintiffs have simply alleged that the gun should contain a device which would prevent discharge when all operations required to make it ready to fire had been deliberately carried out. Defendant states that the plaintiffs have conceded that their alternative design would not have prevented Murray from placing the gun in a ready to fire condition.

This argument is based on the assumption that the gun was intentionally placed in a ready to fire condition and the trigger deliberately pulled when Hammond was shot. However, plaintiffs allege that when the shooting occurred, Murray had not placed the gun in a ready to fire condition. Murray testified that he believed the hammer was in a closed position, and that he was twirling the gun on his finger when it discharged. He specifically testified that he thought the gun would not fire because the hammer was not pulled back all the way.

Viewing the record in a light most favorable to plaintiffs, I find that Murray's testimony is sufficient to raise a question of fact as to whether the gun was defective. See *Bender v. Colt Industries, Inc.*, Mo.Ct. App., 517 S.W.2d 705 (1974); *Johnson v.*

*Colt Industries Operating Corp.*, 10th Cir., 797 F.2d 1530 (1986).

Next defendant argues that plaintiffs have failed to establish that its alleged negligence was the proximate cause of Hammond's injuries.

■ Courts have defined proximate cause as that which brings about or produces, or helps to bring about or produce, the injury complained of, and "but for" which the injury would not have occurred. *Nutt v. GAF Corporation*, Del.Super., 526 A.2d 564, 566 (1987). A plaintiff has not met his burden of establishing causation if he proves that the injury could have been caused by two things, one of which was the defendant's fault and one of which was not, and under all the proven circumstances, there is no reason to believe that one, rather than the other, probably was the true cause. *Ciociola v. Delaware Coca–Cola Bottling Co.*, Del.Supr., 172 A.2d 252 (1961); *Law v. Gallegher*, Del.Supr., 197 A. 479, (1938).

Defendant argues that plaintiffs' expert listed several possibilities as to how the shooting occurred, but could not determine which of these possibilities more probably occurred than not. Defendant contends that each of the possibilities requires the hammer to be cocked and the trigger to be pulled and that plaintiffs' expert has only speculated that one of the possibilities may involve an unintentional firing of the gun. Defendant concludes that plaintiffs have not satisfied their burden because they have merely established that the accident could have occurred in several ways, only one of which defendant would have been responsible for.

Defendant has misconstrued the report and testimony of plaintiffs' expert. While he offered four additional ways in which the gun can be fired other than the designed firing mode, it is his opinion that each of these possibilities constitute an unintentional firing because a user would not expect the gun to fire unless the hammer was fully cocked and the trigger pulled. Martin indicated that if a 20th century manual safety mechanism had been placed on the gun and engaged, a user could do all of the things listed in the four possibilities and the gun would not fire.

In addition, Murray testified that the hammer was in the complete down position and he was twirling the gun on his finger when it discharged. Based on this testimony, Martin opines that the gun fired due to a thumb slip. This evidence indicates that the firing occurred in a mode other than the designed firing mode.

Based on this record, I find that there is an issue of fact as to whether the lack of a modern manual safety mechanism proximately caused Hammond's injuries.

Defendant next argues that even if plaintiffs' theory of how the shooting occurred was sufficient to create a jury question, their theory of causation still fails because there is no evidence that a modern manual safety would have prevented the accident. Defendant relies on Martin's testimony that a manual safety would only have prevented the accident if engaged, and that whether or not one actually engages a manual safety is a matter of an individual's habits, plus whether or not the user is safety minded. Defendant cites numerous facts in support of its assertion that Murray would not have engaged the safety. However, Murray has testified that he knew what a safety was for and was aware that a safety should be engaged until the user is ready to fire to prevent accidental discharge.

I find that Murray's testimony is sufficient to raise a question of fact as to whether or not he would have engaged an additional manual safety on the day of the accident.

■ Finally, defendant argues that Murray's conduct constitutes an intervening and superseding cause. Defendant contends that the Family Court found that Murray had engaged in reckless behavior. Further, defendant states that plaintiffs admitted that Murray was reckless in a separate lawsuit they filed against Murray, his father and the owner of the property where the accident occurred.

Assuming arguendo that Murray was reckless, such a finding does not in and of

itself establish an intervening and superseding cause. Rather, defendant must also show that Murray's recklessness was unforeseeable in order to relieve defendant of liability. *Nutt,* 526 A.2d at 566–567.

I find that defendant has failed to establish as a matter of law that twirling a gun on one's finger is so extraordinary as to be unforeseeable to a gun manufacturer. Defendant relies on *Pepper v. Hoffecker,* 56 Del. 162, 192 A.2d 213 (1963) which I find to be distinguishable. It did not involve allegations of defective design against the gun manufacturer. Rather, plaintiffs sued a minor who had fired the gun, his companion at the time of the shooting and the individual who had loaned them the gun. The Court absolved the companion and the owner of liability on the ground that the minor's act of picking up the gun, cocking the hammer and pulling the trigger thereby firing the gun out of an open car window was not foreseeable to the other defendants. The Court relied in part on the fact that the other defendants knew that the minor was experienced with firearms.

The other cases relied on by defendant are also distinguishable. In each of those cases the user of the gun had intentionally pointed that gun at another and pulled the trigger, and the courts held that manufacturers, retailers or owners of guns could not reasonably foresee that a gun would be used in such intentional criminal activity. See *Martin v. Harrington & Richardson, Inc.,* 7th Cir., 743 F.2d 1200 (1984); *Bennett v. Cincinnati Checker Cab Co., Inc.,* E.D.KY., 353 F.Supp. 1206 (1973); *Adkinson v. Rossi Arms Co.,* Alaska Supr., 659 P.2d 1236 (1983); *Hulsman v. Hemmeter Development Corp.,* 65 Haw. 58, 647 P.2d 713 (1982); *Robinson v. Howard Bros. of Jackson, Inc.,* Miss.Supr., 372 So.2d 1074 (1979); *Perkins v. F.I.E. Corp.,* 5th Cir., 762 F.2d 1250 (1985), reh den. en banc *Richman v. Charter Arms Corp.,* 5th Cir., 768 F.2d 1350 (1985).

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

## MOTION TO DISMISS

In Count II of their Complaint plaintiffs allege that Colt conducted an abnormally dangerous or ultrahazardous activity by intentionally manufacturing and distributing a revolver without incorporating an appropriate safety mechanism. Plaintiffs conclude that Colt is strictly liable for any harm caused by the revolver pursuant to the Restatement (Second) of Torts §§ 519–520.[1]

Defendant argues that Delaware does not extend strict liability to cases involving the sale of a product and that § 519 does not apply to the sale of a product.

Since the Supreme Court's decision in *Cline v. Prowler Industries of Maryland, Inc.,* Del.Supr., 418 A.2d 968 (1980), Delaware courts have refused to extend strict liability to cases involving the sale of a product even where it is alleged that the product is inherently dangerous. *Bell v. Celotex Corporation,* Del.Super., Civil Action No. 85C–FE–25, 1988 WL 7623 Taylor, J. (January 19, 1988) (Order); *In re: Asbestos Litigation,* Del.Super., Civil Action No. 79C–DE–125, Poppiti, J. (September 30, 1985) (Order), application for certification

---

1. Sections 519 and 520 provide as follows:

§ 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

§ 520. Abnormally Dangerous Activities. In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

of interlocutory appeal denied, *Bradley v. Pittsburgh Corning Corp.*, Del.Supr., 505 A.2d 451 (1985) (Order); *Comegys v. Dorsey, Cloroben and Speakman*, Del.Super., Civil Action No. 77C–SE–23, O'Hara, J. (October 15, 1981) (Letter op.).

I am not persuaded by plaintiffs' assertion that the *Bell* decision supports a cause of action based on strict liability in cases involving the sale of an inherently dangerous product. While Judge Taylor analyzed plaintiff's claims in that case under the factors enumerated in § 520 before concluding that the sale of asbestos products was not an abnormally dangerous activity, his holding was also based on the fact that a long line of Delaware cases had rejected the concept of strict liability in the realm of sales. *Bell, supra.* See *Johnson v. Hockessin Tractor, Inc.*, Del.Supr., 420 A.2d 154 (1980) (The doctrine of strict liability has been pre-empted in this State in sales cases by the adoption of the Uniform Commercial Code); *In re: Asbestos Litigation, supra*, (Sale of a product containing an inherently dangerous substance does not remove that sale from the line of cases which have found strict liability to be inapplicable to sales); *Comegys, supra*, (Delaware law in *Cline* rejecting strict liability applies even where the product is inherently dangerous).

Finally, even if Delaware applied §§ 519–520 to cases involving the sale of an inherently dangerous product, defendant could not be held liable under those sections. Plaintiffs allege that defendant should be strictly liable for the manufacture and distribution of the revolver. The comments to § 519 indicate that the marketing of a product is not the kind of activity the section was meant to encompass. *Perkins v. F.I.E. Corp.*, 762 F.2d at 1265; § 519, comment d. Rather, "§ 519 encompasses activities that are dangerous in and of themselves and that can directly cause harm to those in the vicinity, even though conducted with the utmost care to prevent the harm." *Perkins*, 762 F.2d at 1265. The marketing of a gun is not dangerous in and of itself since when injury occurs it is not the result of the sale itself, but the result of actions taken by a third party. *Id.*

Similarly, the marketing of guns cannot be classified as abnormally dangerous under the factors of § 520. Factors (a) and (b) require the existence of a high degree of risk and the likelihood that the harm resulting will be great. While the use of guns may involve a high degree of risk and a likelihood of great harm, it the manufacture and distribution of guns that is alleged to be abnormally dangerous. As noted above, the risks of harm from guns come from their use, not their manufacture and distribution. *Id.*

For the foregoing reasons, I find that Count II of plaintiff's complaint fails to state a claim for which relief can be granted. Defendant's motion to dismiss Count II is GRANTED.